**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

GRAY YARMOUTH ROAD SOLAR LLC,
APA FINANCE IV, LLC,
APA FINANCE III BORROWER, LLC,
APA FINANCE IV HOLDINGS, LLC,
APA FINANCE III BORROWER
HOLDINGS, LLC,
LORING SOLAR LLC,
CARIBOU SOLAR LLC,
ALBION ROAD BENTON SOLAR, LLC,
WALES LEEDS JUNCTION SOLAR LLC,
BD SOLAR SHERMAN LLC,
ROCKWOOD SOLAR PARTNERS, LLC,
ME WEST LEBANON ROAD SOLAR LLC,
GLENBURN BROADWAY SOLAR ONE
LLC,
EXETER MILLS ROAD SOLAR LLC,
ENFIELD HAMMETT ROAD SOLAR LLC,
BD SOLAR DAVES WAY LLC,
CATALYZE RUBY 2021 SOLAR
PORTFOLI, LLC,
CATALYZE SAPPHIRE HOLDINGS II,
LLC,
CATALYZE PYRITE 2023 SOLAR
PORTFOLIO, LLC,
SOL ME AUGUSTA 13 YORK FARM,
LLC,
ME FORT FAIRFIELD, LLC,
ME SANDY RIVER LLC,
GORHAM SOLAR 1, LLC,
MOHAVE POWER HOLDINGS, LLC,
EDPRNA DG BRISTOL I, LLC (F/K/A C2
BRISTOL I LLC),
LUMINACE ABS-2024 ISSUER, LLC,
LUMINACE DEVELOPMENT HOLDINGS
3, LLC,
ARCTURUS 2023 CLASS B MEMBER,
LLC,
LUMINACE DEVELOPMENT HOLDINGS
2, LLC,
MEVS WATERVILLE LLC,
MSD WISCASSET LLC,
OVERLOOK SOLAR PARTNERS, LLC,

Case No. _____

1

TOWER SOLAR PARTNERS, LLC,
GREEN MILE SOLAR, LLC,
MEVS KIGER LLC,
MEVS RICHARDS LLC,
SHINING SOLAR PARTNERS, LLC,
HAYWORTH SOLAR PARTNERS, LLC,
CARRABASSETT SOLAR 1 LLC,
DOWNEAST SOLAR, LLC,
FRONT STREET SOLAR FARM, LLC,
HUGGARD AVENUE SOLAR FARM, LLC,
PENOBSCOT COUNTY ME S1, LLC,
NAUTILUS ISSUER 2022, LLC,
NAUTILUS SOLAR TERM HOLDCO, LLC,
NAUTILUS TERM TRANSFER HOLDCO,
LLC,
NAUTILUS ISSUER 2022 HOLDCO, LLC,
NAUTILUS SOLAR OPCO PARENT, LLC,
NAUTILUS SOLAR DEVCO PARENT,
LLC,
STURGEON SOLAR GREY, LLC,
STURGEON TOWN HOUSE SOLAR, LLC,
FRYEBURG SOLAR, LLC,
WELLS SOLAR, LLC,
STURGEON QUARRY SOLAR, LLC,
CASCO STANDISH SOLAR, LLC,
MAVIS SOLAR NORTH BRIDGTON LLC,
MAVIS OAKLAND, LLC,
NSE AT01, LLC,
NSE FA01, LLC,
WASHINGTON WS03, LLC,
CASCO SIDNEY SOLAR, LLC,
SANFORD SOLAR LLC,
STURGEON RYAN RANCH SOLAR, LLC,
LEEDS ROUTE 106 SOLAR LLC,
NORRIDGEWOCK MARTIN STREAM
SOLAR LLC,
BD SOLAR MASARDIS LLC,
CGA SOLAR LLC,
BD SOLAR LARSON LLC,
BD SOLAR LIMESTONE LLC,
BD SOLAR NICOLIN LLC,
BD SOLAR NORRIDGEWOCK LLC,
BD SOLAR NORTH ANSON LLC,
BD SOLAR RANGELEY LLC,
VEGA PORTFOLIO HOLDINGS I, LLC,
VEGA PORTFOLIO HOLDINGS II, LLC,

2

VEGA PORTFOLIO INTERMEDIATE
HOLDINGS I, LLC,
VEGA PORTFOLIO INTERMEDIATE
HOLDINGS II, LLC,
SOUTH THOMASTON SOLAR, LLC,
MILO CSG, LLC,
LIVERMORE FALLS CSG, LLC,
TPE ME NB11, LLC,
SAMOSET SOLAR, LLC,
MEVS HANSON, LLC,
MARINER SOLAR, LLC,
SURRY SOLAR 1, LLC,
FOOTBRIDGE SOLAR, LLC,
AUBURN RENEWABLES, LLC,
HOLDEN SOLAR, LLC,
FELTS BROOK SOLAR, LLC,
FELT ROAD SOLAR, LLC,
REA I SOLAR HOLDINGS, LLC,
REA INVESTMENTS, LLC,
AZ-REA 2021 SOLAR HOLDINGS ME,
LLC,
ROUTE 3 CHINA PARENT, LLC,
NOBLEBORO SOLAR HOLDINGS, LLC,
PERKINS SOLAR HOLDINGS, LLC,
NUTTING RIDGE 2023 PARENT, LLC,
AUGUSTA ROAD BOWDOIN SOLAR,
LLC,
SEARSMONT ROAD LINCOLNVILLE
SOLAR LLC,
CHURCH HILL ROAD AUGUSTA SOLAR,
LLC,
NORTH NOBLEBORO ROAD
WALDOBORO SOLAR, LLC,
MARIAVILLE ROAD ELLSWORTH
SOLAR, LLC,
ROUTE 3 CHINA SOLAR, LLC,
ROUTE 32 CHINA SOLAR LLC,
PEQUAWKET TRAIL BALDWIN SOLAR
LLC,
PERKINS ROAD BELFAST SOLAR LLC,
NUTTING RIDGE SOLAR LLC,
MARKET STREET GARDINER SOLAR,
LLC,
SKYWAY AVENUE SOLAR FARM LLC,
RENEWPROP LESSOR 5, LLC,
RENEWPROP LESSOR 7, LLC,

3

RENEWPROP LESSOR 9, LLC,
NEXTGRID BITTERBUSH LLC,
NEXTGRID CLIFFROSE LLC,
NEXTGRID CORKWOOD LLC,
NEXTGRID MANGROVE LLC,
NEXTGRID MASTIC LLC,
NEXTGRID PEPPERTREE LLC,
NEXTGRID SWEETLEAF LLC,
NEXTGRID WHITE PINE LLC,
GARDINER A HOLDINGS, LLC,
RE GARDINER SOLAR HOLDINGS, LLC,
SIDNEY SOLAR HOLDINGS, LLC,
GORHAM ME 1 HOLDINGS, LLC,
WALDOBORO HOLDINGS, LLC,
SOMERSET SOLAR HOLDINGS, LLC,
CROWLEY SOLAR HOLDINGS, LLC,
BETHEL HOLDINGS, LLC,
MAXCY'S MILL HOLDINGS, LLC,
GATEWAY SOLAR HOLDINGS, LLC,
KNIGHTS POND HOLDINGS, LLC,
HERMON HOLDINGS, LLC,
LINCOLN ME 1 HOLDINGS, LLC,
UNION STREET SOLAR HOLDINGS,
LLC,
MARSHFIELD SOLAR HOLDINGS, LLC,
BELFAST PV HOLDINGS, LLC,
OXFORD SOLAR HOLDINGS, LLC,
GARDINER A, LLC,
RE GARDINER SOLAR LLC,
RE SIDNEY SOLAR LLC,
GORHAM ME 1, LLC,
WALDOBORO SOLAR LLC,
SOMERSET SOLAR, LLC,
CROWLEY SOLAR LLC,
NRS BETHEL SOLAR, LLC,
MAXCY'S MILL SOLAR LLC,
GATEWAY SOLAR, LLC,
KNIGHTS POND SOLAR, LLC,
HERMON SOLAR, LLC,
LINCOLN ME 1, LLC,
UNION STREET SOLAR, LLC,
MARSHFIELD SOLAR, LLC,
BELFAST PV, LLC,
OXFORD SOLAR, LLC,
SPME FINANCE ME I, LLC,
SPME FINANCE ME II, LLC,

4

SPME FINANCE ME III, LLC,
BELFAST SOLAR I, LLC,
EDGECOMB SOLAR I, LLC,
READFIELD SOLAR I, LLC,
RIVERSIDE SOLAR, LLC,
WALDOBORO SOLAR I, LLC,
WISCASSET SOLAR I, LLC,

                                    Plaintiffs,

v.

MAINE PUBLIC UTILITIES
COMMISSION,

PHILIP L. BARTLETT II, in his official
capacity as Chairman of the Maine Public
Utilities Commission,

PATRICK SCULLY, in his official capacity
as Commissioner of the Maine Public Utilities
Commission, and

CAROLYN GILBERT, in her official
capacity as Commissioner of the Maine
Public Utilities Commission.

                                    Defendants.

## VERIFIED COMPLAINT
## (REQUEST FOR IMMEDIATE RELIEF)

The Plaintiffs described in the caption above and identified below, by and through their undersigned attorneys, complain against the Maine Public Utilities Commission (the "PUC"); Philip L. Bartlett, II ("Chairman Bartlett"), in his official capacity as Chairman of the PUC; Patrick Scully ("Commissioner Scully"), in his official capacity as Commissioner of the PUC; and Carolyn Gilbert ("Commissioner Gilbert"), in her official capacity as Commissioner of the PUC (together, "Defendants") as follows:

#18676920v9

## INTRODUCTION

1.      In 2019, Maine set out to expand the generation of solar energy across the state. It did so to advance a series of important goals identified by policymakers—on climate change, grid reliability, and consumer choice. To accomplish these goals, Maine turned to private industry. Maine did so by creating a "net energy billing" program (the "NEB Program," codified at 35-A M.R.S. §§ 3209-A through 3209-I) purpose-built to induce investment in renewable energy generation by allowing sponsors of community solar projects to recover project costs over long-term contracts with residential, commercial, and industrial customers. Project sponsors, including Plaintiffs here, took up the challenge, and invested nearly $1 billion to develop, construct, and operate  large solar arrays, referred to in Maine law as Distributed Generation Resources ("DGRs"), across the state. And as a result, Maine got what it wanted: Where in 2018 solar power was just a rounding error on the State's electricity supply, today it can power over 340,000 homes—the vast majority via community solar projects supported by the NEB program. Together, Plaintiffs operate 111 DGRs in Maine, providing solar capacity of approximately 415 megawatts ("MW").

2.      Now that Maine has the DGRs it desired, however, it has enacted new legislation that pulls out the rug and substantially burdens the very community solar projects created in reliance on the NEB program. *See* LD 1777, *An Act to Reduce Costs and Increase Customer Protections of the State's Net Energy Billing Programs*, chaptered as P.L. 2025, c. 480 ("LD 1777"). On some community solar projects, Maine has imposed a new, arbitrary charge. On others, it has slashed the rate project sponsors receive for the power their DGRs generate. And because, once installed, DGRs are tied to and integrated within real property and arise overwhelmingly from the investment of up-front costs, project sponsors are hostage to Maine's exactions: They cannot

respond to Maine's reversal by taking their DGRs elsewhere. Maine is poised to squeeze captive project sponsors to extract the economic value from their community solar projects and redirect this value to the State's own ends.

3.     LD 1777 threatens the continued viability of Plaintiffs' community solar projects and stands to upend Maine's progress toward achieving its sustainability goals. In so doing, LD 1777 violates the United States Constitution in two ways: it enacts an unconstitutional taking of Plaintiffs' property in violation of the Fifth Amendment of the United States Constitution and impairs lawful contracts in violation of the Contracts Clause. The Court must not allow the offending elements of LD 1777 to stand.

## PARTIES

4.     For ease of reference, Plaintiffs are described herein by the names of their ultimate owners.

5.     Those Plaintiffs that are project sponsors—that is the owners, managers, and operators of DGRs enrolled in the kWh Credit Program (a subset of the NEB Program, discussed below)—are referred to as "KWH Plaintiffs." *See* 65-407 C.M.R. ch. 313, § 2(X).

6.     Those Plaintiffs that are project sponsors of DGRs enrolled in the Tariff Rate Program (a different subset of the NEB Program, also discussed below) are referred to as "Tariff Rate Plaintiffs." *Id.*

7.     Those Plaintiffs that are named in connection with their payment obligations and other covenants associated with financing for community solar projects are referred to as "Obligor Plaintiffs."

8.     Those Plaintiffs that are named in connection with their pledges of collateral in support of financing obligations and other covenants are referred to as "Pledgor Plaintiffs."

#18676920v9

**The Altus Plaintiffs**

9.      The following Plaintiff entities are ultimately owned and/or controlled by non-party Altus Power, Inc. ("Altus"):

**i. The Altus Obligor Plaintiffs**

    a.    *APA Finance IV, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to a loan obtained to finance the DGRs owned by two of the Altus Tariff Rate Plaintiffs and the Altus KWH Plaintiffs, defined below.

    b.    *APA Finance III Borrower, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to a loan obtained to finance a DGR owned by one of the Altus Tariff Rate Plaintiffs.

**ii. The Altus Pledgor Plaintiffs**

    a.    *APA Finance IV Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interest in APA Finance IV, LLC as collateral for the loan obtained by APA Finance IV, LLC to finance DGRs owned by the Altus Tariff Rate Plaintiffs and the Altus KWH Plaintiffs.

    b.    *APA Finance III Borrower Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interest in APA Finance III Borrower, LLC as collateral for the loan obtained by APA Finance III Borrower, LLC to finance a DGR owned by one of the Altus Tariff Rate Plaintiffs.

#18676920v9

### iii. The Altus Tariff Rate Plaintiffs

a. *Loring Solar LLC* is a Maryland Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at N. Cutt Rd. & West Gate Rd., Limestone, ME 04750, with a nameplate capacity of approximately 4.1 MW.

b. *Caribou Solar LLC* is a Maryland Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at Orgen Rd., Caribou, ME 04736 with a nameplate capacity of approximately 4.1 MW.

c. *Albion Road Benton Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 165 Albion Rd., Benton, ME 04901 with a nameplate capacity of approximately .87 MW.

### iv. The Altus KWH Plaintiffs

a. *Wales Leeds Junction Solar LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at Leeds Junction Rd., Wales, ME 04280 with a nameplate capacity of approximately 4.5 MW.

b. *BD Solar Sherman LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 333 Station Rd., Sherman, ME 04776 with a nameplate capacity of approximately 3 MW.

c. *Rockwood Solar Partners, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and

#18676920v9

operates a DGR located at 1545 Union Street, Bangor, Maine, 04401 with a nameplate capacity of approximately 1.9 MW.

d. *ME West Lebanon Road Solar LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 252 W Lebanon Rd., Lebanon, ME 04027 with a nameplate capacity of approximately 1.9 MW.

e. *Gray Yarmouth Road Solar LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 51 Yarmouth Rd., Gray, ME 04039 with a nameplate capacity of approximately 4.9 MW.

f. *Glenburn Broadway Solar One LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 2865 Broadway, Glenburn, ME 04401 with a nameplate capacity of approximately 4.9 MW.

g. *Exeter Mills Road Solar LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 37 Mills Rd., Exeter, ME 04435 with a nameplate capacity of approximately 4 MW.

h. *Enfield Hammett Road Solar LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 13f Hammett Rd., Enfield, ME 04493 with a nameplate capacity of approximately 4.9 MW.

i. *BD Solar Daves Way LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 126 Daves Way # 131, Hermon, ME 04401, ME 04401 with a nameplate capacity of approximately 4.9 MW.

**The Catalyze Plaintiffs**

10. The following Plaintiff entities are ultimately owned and/or controlled by non-party Catalyze Holdings, LLC ("Catalyze"):

### i. The Catalyze Obligor Plaintiffs

a. *Catalyze Ruby 2021 Solar Portfolio, LLC* is a Delaware Limited Liability Company that is subject to certain payment obligations and other covenants with respect to financing obtained to finance the DGR owned by one of the Catalyze KWH Plaintiffs.

b. *Catalyze Sapphire Holdings II, LLC* is a Delaware Limited Liability Company that is subject to certain payment obligations and other covenants with respect to financing obtained to finance the DGR owned by one of the Catalyze KWH Plaintiffs.

c. *Catalyze Pyrite 2023 Solar Portfolio, LLC* is a Delaware Limited Liability Company that is subject to certain payment obligations and other covenants with respect to financing obtained to finance the DGR owned by the Catalyze Tariff Rate Plaintiff.

### ii. The Catalyze Tariff Rate Plaintiff

a. *SOL ME Augusta 13 York Farm, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 13 York Farm Road, Augusta, ME 04330 with a nameplate capacity of approximately .9 MW. SOL ME Augusta 13 York Farm, LLC is subject to certain payment obligations and other covenants with respect to financing it obtained to finance its DGR.

### iii. The Catalyze KWH Plaintiffs

a. *ME Fort Fairfield, LLC* is a Florida Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 175 Fort Rd., Presque Isle, ME 04769 with a nameplate capacity of

#18676920v9

approximately 2.8 MW. ME Fort Fairfield, LLC is subject to certain payment obligations and other covenants with respect to financing it obtained to finance its DGR

b. *ME Sandy River LLC* is a Florida Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 15 Glen Harris Rd., New Sharon, ME 04955 with a nameplate capacity of approximately 3.5 MW. ME Sandy River LLC is subject to certain payment obligations and other covenants with respect to financing it obtained to finance its DGR.

**The CleanCapital Plaintiffs**

11.    The following Plaintiff entities are ultimately owned and/or controlled by non-party CleanCapital Holdings, LLC ("CleanCapital"):

**i. The CleanCapital KWH Plaintiff**

a. *Gorham Solar 1, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 135 Brackett Rd., Gorham, ME 04038 with a nameplate capacity of approximately 4.9 MW. Gorham Solar 1, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

**The EDPR Plaintiffs**

12.    The following Plaintiff entities are ultimately owned and/or controlled by non-party EDPR NA Distributed Generation LLC ("EDPR"):

12

**i. The EDPR Obligor Plaintiff**

    a.  *Mohave Power Holdings, LLC* is a Delaware Limited Liability Company that is subject to certain payment obligations and other covenants with respect to financing obtained to finance the DGR owned by the EDPR KWH Plaintiff.

**ii. The EDPR KWH Plaintiff**

    a.  *EDPRNA DG Bristol I, LLC (f/k/a C2 Bristol I LLC)* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 1442 Bristol Road, Bristol, ME 04539 with a nameplate capacity of approximately 3.5 MW. EDPRNA DG Bristol I, LLC (f/k/a C2 Bristol I LLC) is subject to certain payment obligations and other covenants with respect to financing it obtained to finance its DGR.

**The Luminace Plaintiffs**

13.    The following Plaintiff entities are ultimately owned and/or controlled by non-party Luminace Holdings, LLC ("Luminace"):

**i. The Luminace Obligor Plaintiffs**

    a.  *Luminace ABS-2024 Issuer, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance the DGRs owned by one or more of the Luminace Tariff Rate Plaintiffs and/or the Luminace KWH Plaintiffs.

    b.  *Luminace Development Holdings 3, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance the DGRs owned by one or more of the Luminace KWH Plaintiffs.

13

**ii. The Luminace Pledgor Plaintiffs**

a. *Arcturus 2023 Class B Member, LLC* is a Delaware Limited Liability Company that has pledged its equity interest in Arcturus 2023, LLC as collateral for the loan obtained by Luminace ABS-2024 Issuer, LLC to finance the DGRs owned by one or more of the Luminace Tariff Rate Plaintiffs and/or the Luminace KWH Plaintiffs.

b. *Luminace Development Holdings 2, LLC* is a Delaware Limited Liability Company that has pledged its equity interest in Luminace Development Holdings 3, LLC as collateral for the loan obtained by Luminace Development Holdings 3, LLC to finance the DGRs owned by one or more of the Luminace KWH Plaintiffs.

**iii. The Luminace Tariff Rate Plaintiffs**

a. *MEVS Waterville LLC* is a California Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 2 Lafleur Road, Waterville, ME 04901 with a nameplate capacity of approximately 4.9 MW.

b. *MSD Wiscasset LLC* is a California Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 129 Old Ferry Road, Wiscasset, ME 04578 with a nameplate capacity of approximately 4.9 MW.

c. *Overlook Solar Partners, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 46 Christian Hill Road, Bristol, ME 04539 with a nameplate capacity of approximately 4.9 MW.

14

d. *Tower Solar Partners, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 961 Kennebec River Road, Embden, ME 04958 with a nameplate capacity of approximately 4.9 MW.

e. *Green Mile Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 84 Nequasset Road, Woolwich, ME 04579 with a nameplate capacity of approximately 4.9 MW.

**iv. The Luminace KWH Plaintiffs**

a. *MEVS Kiger LLC* is a California Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at Murphy Road, Embden, Maine 04958 with a nameplate capacity of approximately 1 MW.

b. *MEVS Richards LLC* is a California Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 421 Skowhegan Road, Fairfield, ME 04937 with a nameplate capacity of approximately 1 MW.

c. *Shining Solar Partners, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 51 Back Searsport Rd., Belfast, ME 04915 with a nameplate capacity of approximately 4.9 MW.

d. *Hayworth Solar Partners, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and

15

operates a DGR located at 268 Old Webster Road, Lewiston, ME 04240 with a nameplate capacity of approximately 4.9 MW.

e.   *Carrabassett Solar 1 LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 4064 Carrabassett Drive, Carrabassett Valley, ME 04947 with a nameplate capacity of approximately 4.9 MW.

f.   *Downeast Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 38 Debeck Drive, Holden, ME 04429 with a nameplate capacity of approximately 4.9 MW.

g.   *Front Street Solar Farm, LLC* is a Florida Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 369 West Front Street, Skowhegan, ME 04976 with a nameplate capacity of approximately 3.2 MW.

h.   *Huggard Avenue Solar Farm, LLC* is a Florida Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 68 Trafton Ave., Limestone, ME 04750 with a nameplate capacity of approximately 2.5 MW.

i.   *Penobscot County ME S1, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at Shin Pond Road, Patten, ME 04765 with a nameplate capacity of approximately 3 MW.

**The Nautilus Plaintiffs**

14.   The following Plaintiff entities are ultimately owned and/or controlled by non-party Nautilus US Power Holdco, LLC ("Nautilus"):

#18676920v9

### i. The Nautilus Obligor Plaintiffs

  a. *Nautilus Issuer 2022, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance the DGRs owned by one or more of the Nautilus Tariff Rate Plaintiffs and/or the Nautilus KWH Plaintiffs.

  b. *Nautilus Solar Term Holdco, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance the DGRs owned by one or more of the Nautilus Tariff Rate Plaintiffs and/or the Nautilus KWH Plaintiffs.

  c. *Nautilus Term Transfer Holdco, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance the DGRs owned by one or more of the Nautilus Tariff Rate Plaintiffs and/or the Nautilus KWH Plaintiffs.

### ii. The Nautilus Pledgor Plaintiffs

  a. *Nautilus Issuer 2022 Holdco, LLC* is a Delaware Limited Liability Company that has pledged its equity interest in Nautilus Issuer 2022, LLC as collateral for the loan obtained by Nautilus Issuer 2022, LLC to finance the DGRs owned by one or more of the Nautilus Tariff Rate Plaintiffs and/or the Nautilus KWH Plaintiffs.

  b. *Nautilus Solar Opco Parent, LLC* is a Delaware Limited Liability Company that has pledged its equity interest in Nautilus Solar Term Holdco, LLC as collateral for the loan obtained by Nautilus Solar Term Holdco, LLC and Nautilus Term Transfer Holdco, LLC to finance the DGRs owned by one or more of the Nautilus Tariff Rate Plaintiffs and/or the Nautilus KWH Plaintiffs.

#18676920v9

c. *Nautilus Solar Devco Parent, LLC* is a Delaware Limited Liability Company that has pledged its equity interest in Nautilus Term Transfer Holdco, LLC as collateral for the loan obtained by Nautilus Solar Term Holdco, LLC and Nautilus Term Transfer Holdco, LLC to finance the DGRs owned by one or more of the Nautilus Tariff Rate Plaintiffs and/or the Nautilus KWH Plaintiffs.

### iii. The Nautilus Tariff Rate Plaintiffs

a. *Sturgeon Solar Grey, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 97 Shaker Road, Gray, ME 04073 with a nameplate capacity of approximately 4.9 MW.

b. *Sturgeon Town House Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 351 Hallowell Rd., Chelsea, ME 04330 with a nameplate capacity of approximately 4.9 MW.

c. *Fryeburg Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 182 Bridgton Road, Fryeburg, ME 04037 with a nameplate capacity of approximately 4.9 MW.

d. *Wells Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 207 Crediford Road, Wells, ME 04090 with a nameplate capacity of approximately 4.8 MW.

#18676920v9

e. *Sturgeon Quarry Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 486 High Street, North Berwick, ME 03906 with a nameplate capacity of approximately 4.9 MW.

f. *Casco Standish Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 30 Moody Road, Standish, ME 04084 with a nameplate capacity of approximately 4.9 MW.

**iv. The Nautilus KWH Plaintiffs**

a. *Mavis Solar North Bridgton LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 10 Chadbourne Hill Road, Bridgton, ME 04009 with a nameplate capacity of approximately 4.9 MW.

b. *Mavis Oakland, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 404 Fairfield Street, Oakland, ME 04963 with a nameplate capacity of approximately 4.9 MW.

c. *NSE AT01, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 211 Harmony Road, Athens, ME 04912 with a nameplate capacity of approximately 4.9 MW.

d. *NSE FA01, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 326 Bowman Road, Farmingdale, ME 04344 with a nameplate capacity of approximately 4.8 MW.

#18676920v9

e.  *Washington WS03, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 574 Waldoboro Road, Washington, ME 04574 with a nameplate capacity of approximately 4 MW.

f.  *Casco Sidney Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 248 Lyons Road, Sidney, ME 04330 with a nameplate capacity of approximately 1.5 MW.

g.  *Sanford Solar LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 81 Rushton Street, Sanford, ME 04073 with a nameplate capacity of approximately 4.8 MW.

h.  *Sturgeon Ryan Ranch Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 291 Fore Street, Paris, ME 04270 with a nameplate capacity of approximately 3 MW.

i.  *Leeds Route 106 Solar LLC* is a Maine Limited Liability Company which owns, manages, and operates a DGR located at 1053 Route 106, Leeds, ME 04263 with a nameplate capacity of approximately 4.9 MW.

j.  *Norridgewock Martin Stream Solar LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 172 Smithfield Road, Norridgewock, ME 04957 with a nameplate capacity of approximately 1.9 MW.

20

k.  *BD Solar Masardis LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 63 Sterling Ridge Road, Masardis, ME 04732 with a nameplate capacity of approximately 4.9 MW.

l.  *CGA Solar LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 229 New Dam Road, Sanford, ME 04073 with a nameplate capacity of approximately 4.9 MW.

m.  *BD Solar Larson LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 52 Larson Way, Westbrook, ME 04092 with a nameplate capacity of approximately 4.9 MW.

n.  *BD Solar Limestone LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 32 Connecticut Road, Limestone, ME 04750 with a nameplate capacity of approximately 4 MW.

o.  *BD Solar Nicolin LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at Nicolin Road, Ellsworth, ME 04605 with a nameplate capacity of approximately 3.3 MW.

p.  *BD Solar Norridgewock LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 110 Winding Hill Rd., Norridgewock, ME 04957 with a nameplate capacity of approximately 1.9 MW.

q.  *BD Solar North Anson LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 3 Valley Road, North Anson, ME 04958 with a nameplate capacity of approximately 1.9 MW.

r.  *BD Solar Rangeley LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 204 Pleasant Street, Rangeley, ME 04970 with a nameplate capacity of approximately 4.9 MW.

**The Nexamp Plaintiffs**

15.    The following Plaintiff entities are ultimately owned and/or controlled by non-party Nexamp, Inc. ("Nexamp"):

**i. The Nexamp Obligor Plaintiffs**

a.  *Vega Portfolio Holdings I, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance the DGRs owned by one or more of the Nexamp KWH Plaintiffs.

b.  *Vega Portfolio Holdings II, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance the DGRs owned by one or more of the Nexamp Tariff Rate Plaintiffs and/or Nexamp KWH Plaintiffs.

**ii. The Nexamp Pledgor Plaintiffs**

a.  *Vega Portfolio Intermediate Holdings I, LLC* is a Delaware Limited Liability Company that has pledged its equity interest in Vega Portfolio Holdings I, LLC as collateral for the loan obtained by Vega Portfolio Holdings I, LLC to finance the DGRs owned by one or more of the Nexamp Tariff Rate Plaintiffs and/or Nexamp KWH Plaintiffs.

b.  *Vega Portfolio Intermediate Holdings II, LLC* is a Delaware Limited Liability Company that has pledged its equity interest in Vega Portfolio Holdings II, LLC as

22

collateral for the loan obtained by Vega Portfolio Holdings II, LLC to finance the DGRs owned by one or more of the Nexamp KWH Plaintiffs.

### iii. The Nexamp Tariff Rate Plaintiff

a. *South Thomaston Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 466 St. George Road, South Thomaston, ME 04858 with a nameplate capacity of approximately 4 MW.

### iv. The Nexamp KWH Plaintiffs

a. *Milo CSG, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 221 W Main St, Milo, ME 04463 with a nameplate capacity of approximately 1.9 MW.

b. *Livermore Falls CSG, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 133 Moose Hill Road, Livermore Falls, ME 04254 with a nameplate capacity of approximately 3.2 MW.

c. *TPE ME NB11, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 30 Coffin Road , North Berwick, ME 04357 with a nameplate capacity of approximately 4.9 MW.

d. *Samoset Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 351 Rockland St, Rockport, ME 04856 with a nameplate capacity of approximately 2.1 MW.

e. *MEVS Hanson, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a

23

DGR located at 180 Salmon Falls Road, Hollis, ME 0404 with a nameplate capacity of approximately 4.9 MW.

f.  *Mariner Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 89 Maranacook Road, Winthrop, ME 04364 with a nameplate capacity of approximately 2.4 MW.

g.  *Surry Solar 1, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 941 Surry Road, Surry, ME 04684 with a nameplate capacity of approximately 4.9 MW.

h.  *Footbridge Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 1612 Main Street, Harrington, ME 04643 with a nameplate capacity of approximately 2.2 MW.

i.  *Auburn Renewables, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 1115 Riverside Drive, Auburn, ME 04210 with a nameplate capacity of approximately 4.9 MW.

j.  *Holden Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 780 Main Rd , Holden, ME 04429 with a nameplate capacity of approximately 2.4 MW.

k.  *Felts Brook Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 575 Eastern Ave, Brewer, ME 04412 with a nameplate capacity of approximately 1.9 MW.

24

l.   *Felt Road Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 179 Cushman Road, Woodstock, ME 04219 with a nameplate capacity of approximately 1.9 MW.

**The REA Plaintiffs**

16.   The following Plaintiff entities are ultimately owned and/or controlled by non-party Renewable Energy Alternatives, LLC ("REA") and/or by REA Investments, LLC:

**i. The REA Obligor Plaintiffs**

a.   *REA I Solar Holdings, LLC* is a Missouri Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance the DGRs owned by one or more of the REA Tariff Rate Plaintiffs and/or REA KWH Credit Plaintiffs.

b.   *REA Investments, LLC* is a Missouri Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance the DGRs owned by one or more of the REA Tariff Rate Plaintiffs and/or REA KWH Credit Plaintiffs. REA Investments, LLC has also pledged its equity interest in several entities upstream of the REA Tariff Rate Plaintiffs and/or REA KWH Credit Plaintiffs as collateral for the loans obtained to acquire those Plaintiffs' DGRs.

**ii. The REA Pledgor Plaintiffs**

a.   *AZ-REA 2021 Solar Holdings ME, LLC* is a Missouri Limited Liability Company that has pledged its equity interests in (a) Pequawket Trail Baldwin Solar LLC as collateral for the loan obtained by Pequawket Trail Baldwin Solar LLC to finance

25

the DGR owned by Pequawket Trail Baldwin Solar LLC, (b) Route 32 China Solar LLC as collateral for the loan obtained by Route 32 China Solar LLC to finance the DGR owned by Route 32 China Solar LLC; and (c) Augusta Road Bowdoin Solar, LLC as collateral for the loan obtained by Augusta Road Bowdoin Solar, LLC to finance the DGR owned by Augusta Road Bowdoin Solar, LLC.

b. *Route 3 China Parent, LLC* is a Missouri Limited Liability Company that has pledged its equity interest in Route 3 China Solar, LLC as collateral for the loan obtained by Route 3 China Solar, LLC to finance the DGR owned by Route 3 China Solar, LLC.

c. *Nobleboro Solar Holdings, LLC* is a Missouri Limited Liability Company that has pledged its equity interest in North Nobleboro Road Waldoboro Solar, LLC as collateral for the loan obtained by North Nobleboro Road Waldoboro Solar, LLC to finance the DGR owned by North Nobleboro Road Waldoboro Solar, LLC.

d. *Perkins Solar Holdings, LLC* is a Missouri Limited Liability Company that has pledged its equity interest in Perkins Road Belfast Solar, LLC as collateral for the loan obtained by Perkins Road Belfast Solar, LLC to finance the DGR owned by Perkins Road Belfast Solar, LLC.

e. *Nutting Ridge 2023 Parent, LLC* is a Missouri Limited Liability Company that has pledged its equity interest in Nutting Ridge Solar LLC as collateral for the loan obtained by Nutting Ridge Solar LLC to finance the DGR owned by Nutting Ridge Solar LLC.

#18676920v9

### iii. The REA Tariff Rate Plaintiffs

a. *Augusta Road Bowdoin Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 1052 Augusta Road, Bowdoin, ME 04287 with a nameplate capacity of approximately 3.6 MW. Augusta Road Bowdoin Solar, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

b. *Searsmont Road Lincolnville Solar LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 105 Searsmont Road, Lincolnville, ME 04849 with a nameplate capacity of approximately 4 MW.

c. *Church Hill Road Augusta Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 823 Church Hill Road, Augusta, ME 04330 with a nameplate capacity of approximately 3.8 MW. Church Hill Road Augusta Solar, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

d. *North Nobleboro Road Waldoboro Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 645 North Nobleboro Rd., Waldoboro, ME 04572 with a nameplate capacity of approximately 2.5 MW. North Nobleboro Road Waldoboro Solar, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

27

e.  *Mariaville Road Ellsworth Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at Middle Mariaville Rd., Ellsworth, ME 04605 with a nameplate capacity of approximately 1.6 MW.

f.  *Route 3 China Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 987 Route 3, China, ME 04358 with a nameplate capacity of approximately 4.5 MW. Route 3 China Solar, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

### iv. The REA KWH Plaintiffs

a.  *Route 32 China Solar LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 433 Arnold Road, China, ME 04358 with a nameplate capacity of approximately 4.8 MW. Route 32 China Solar LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

b.  *Pequawket Trail Baldwin Solar LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 1092 Pequawket Trail, Baldwin, ME 04091 with a nameplate capacity of approximately 4.9 MW. Pequawket Trail Baldwin Solar LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

#18676920v9

c. *Perkins Road Belfast Solar LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 0 Perkins Road, Belfast, ME 04915 with a nameplate capacity of approximately 4.8 MW. Perkins Road Belfast Solar LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

d. *Nutting Ridge Solar LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 723 Oxford Road, Otisfield, ME 04270 with a nameplate capacity of approximately 4 MW. Nutting Ridge Solar LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

e. *Market Street Gardiner Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 47 Market Street, Gardiner, ME 04345 with a nameplate capacity of approximately 3.2 MW.

f. *Skyway Avenue Solar Farm LLC* is a Florida Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 153 Main Street, Frenchville, ME 04745 with a nameplate capacity of approximately 2.5 MW. Skyway Avenue Solar Farm LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

#18676920v9

**The Renewable Properties Plaintiffs**

17.    The following Plaintiff entities are ultimately owned and/or controlled by non-party Renewable Properties, LLC ("Renewable Properties"):

**i. The Renewable Properties Pledgor Plaintiffs**

    a.  *RenewProp Lessor 5, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in NextGrid Cliffrose LLC, NextGrid Mangrove LLC, NextGrid Peppertree LLC, and NextGrid Mastic LLC as collateral for the loans obtained by those entities to finance the DGRs owned those entities.

    b.  *RenewProp Lessor 7, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in NextGrid Bitterbush LLC and NextGrid Corkwood LLC as collateral for the loans obtained by those entities to finance the DGRs owned those entities.

    c.  *RenewProp Lessor 9, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in NextGrid Sweetleaf LLC, and NextGrid White Pine LLC as collateral for the loans obtained by those entities to finance the DGRs owned those entities.

**ii. The Renewable Properties Tariff Rate Plaintiff**

    a.  *NextGrid Bitterbush LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 2111 Broadway, Bangor, ME 04401 with a nameplate capacity of approximately 4.6 MW. NextGrid Bitterbush LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

#18676920v9

### iii. The Renewable Properties KWH Plaintiffs

a. *NextGrid Cliffrose LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 1875 Lisbon Street, Lewiston, ME 04240 with a nameplate capacity of approximately 2 MW. NextGrid Cliffrose LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

b. *NextGrid Corkwood LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 105 Water Street, Howland, ME 04448 with a nameplate capacity of approximately 4.6 MW. NextGrid Corkwood LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

c. *NextGrid Mangrove LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 265 Merrill Road, Lewiston, ME 04240 with a nameplate capacity of approximately 4.6 MW, as reflected by records provided by the company to its electric utility. NextGrid Mangrove LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

d. *NextGrid Mastic LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 0 Webb Road, Waterville, ME 04901 with a nameplate capacity

31

of approximately 4.6 MW. NextGrid Mastic LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

e. *NextGrid Peppertree LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 101 NextGrid Lane, Poland, ME 04272 with a nameplate capacity of approximately 4.8 MW. NextGrid Peppertree LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

f. *NextGrid Sweetleaf LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 85 Roderick Road, Winslow, ME 04901 with a nameplate capacity of approximately 4.6 MW. NextGrid Sweetleaf LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

g. *NextGrid White Pine LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 615 Pushaw Road, Bangor, ME 04401 with a nameplate capacity of approximately 4 MW. NextGrid White Pine LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

#18676920v9

**The Summit Ridge Plaintiffs**

18.     The following Plaintiff entities are ultimately owned and/or controlled by non-party Summit Ridge Energy, LLC ("Summit Ridge"):

**i. The Summit Ridge Pledgor Plaintiffs**

a. *Gardiner A Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Gardiner A LLC as collateral for the loan obtained by that entity to finance its DGR.

b. *RE Gardiner Solar Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in RE Gardiner Solar LLC as collateral for the loan obtained by that entity to finance its DGR.

c. *Sidney Solar Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in RE Sidney Solar LLC as collateral for the loan obtained by that entity to finance its DGR.

d. *Gorham ME 1 Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Gorham ME 1, LLC as collateral for the loan obtained by that entity to finance its DGR.

e. *Waldoboro Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Waldoboro Solar LLC as collateral for the loan obtained by that entity to finance its DGR.

f. *Somerset Solar Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Somerset Solar LLC as collateral for the loan obtained by that entity to finance its DGR.

#18676920v9

g.  *Crowley Solar Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Crowley Solar LLC as collateral for the loan obtained by that entity to finance its DGR.

h.  *Bethel Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in NRS Bethel Solar LLC as collateral for the loan obtained by that entity to finance its DGR.

i.  *Maxcy's Mill Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Maxcy's Mill Solar LLC as collateral for the loan obtained by that entity to finance its DGR.

j.  *Gateway Solar Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Gateway Solar LLC as collateral for the loan obtained by that entity to finance its DGR.

k.  *Knights Pond Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Knights Pond Solar LLC as collateral for the loan obtained by that entity to finance its DGR.

l.  *Hermon Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Hermon Solar LLC as collateral for the loan obtained by that entity to finance its DGR.

m.  *Lincoln ME 1 Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Lincoln ME 1, LLC as collateral for the loan obtained by that entity to finance its DGR.

n. *Union Street Solar Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Union Street Solar, LLC as collateral for the loan obtained by that entity to finance its DGR.

o. *Marshfield Solar Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Marshfield Solar, LLC as collateral for the loan obtained by that entity to finance its DGR.

p. *Belfast PV Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Belfast PV, LLC as collateral for the loan obtained by that entity to finance its DGR.

q. *Oxford Solar Holdings, LLC* is a Delaware Limited Liability Company that has pledged its equity interests in Oxford Solar, LLC as collateral for the loan obtained by that entity to finance its DGR.

**ii. The Summit Ridge Tariff Rate Plaintiffs**

a. *Gardiner A, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 266 Highland Avenue, Gardiner, ME 04345 with a nameplate capacity of approximately 4 MW. Gardiner A, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

b. *RE Gardiner Solar LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 329 River Road, Gardiner, ME 04860 with a nameplate capacity of approximately 3.9 MW. RE Gardiner Solar LLC is

35

subject to certain loan payment obligations and other loan covenants with respect
to a loan it obtained to finance its DGR.

    c.  *RE Sidney Solar LLC* is a Maine Limited Liability Company, which owns,
manages, and operates a DGR located at 45 Shepherd Road, Sidney, ME 04330
with a nameplate capacity of approximately 2 MW. RE Sidney Solar LLC is
subject to certain loan payment obligations and other loan covenants with respect
to a loan it obtained to finance its DGR.

    d.  *Gorham ME 1, LLC* is a Delaware Limited Liability Company authorized to
conduct business in the State of Maine, which owns, manages, and operates a
DGR located at 17 Nonesuch Road, Gorham, ME 04038 with a nameplate
capacity of approximately 4.9 MW. Gorham ME 1, LLC is subject to certain loan
payment obligations and other loan covenants with respect to a loan it obtained to
finance its DGR.

### iii. The Summit Ridge KWH Plaintiffs

    a.  *Waldoboro Solar LLC* is a Delaware Limited Liability Company authorized to
conduct business in the State of Maine, which owns, manages, and operates a
DGR located at 312 Waldoboro Road, Washington, ME 04574 with a nameplate
capacity of approximately 2 MW. Waldoboro Solar LLC is subject to certain loan
payment obligations and other loan covenants with respect to a loan it obtained to
finance its DGR.

    b.  *Somerset Solar, LLC* is a Maine Limited Liability Company, which owns,
manages, and operates a DGR located at 510 Somerset Avenue, Pittsfield, ME
04967 with a nameplate capacity of approximately 4.9 MW. Somerset Solar, LLC

#18676920v9

is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

c.  *Crowley Solar LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 308 Crowley Road, Sabattus, ME 04280 with a nameplate capacity of approximately 2 MW. Crowley Solar LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

d.  *NRS Bethel Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at Walker's Mill Road, Bethel, ME 04217 with a nameplate capacity of approximately 2.9 MW. NRS Bethel Solar, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

e.  *Maxcy's Mill Solar LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 163 Maxcy's Mill Road, Windsor, ME 04363 with a nameplate capacity of approximately 2 MW. Maxcy's Mill Solar LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

f.  *Gateway Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 1963 Medway Rd., Medway, ME 04460 with a nameplate capacity of approximately 4 MW. Gateway Solar, LLC is

subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

g.  *Knights Pond Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 49 Junction Road, South Berwick, ME 03908 with a nameplate capacity of approximately 3.8 MW. Knights Pond Solar, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

h.  *Hermon Solar, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 1640 Hammond Street, Hermon, ME 04401 with a nameplate capacity of approximately 4.9 MW. Hermon Solar, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

i.  *Lincoln ME 1, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at Enfield Road, Lincoln, ME 04457 with a nameplate capacity of approximately 4.8 MW. Lincoln ME 1, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

j.  *Union Street Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 1801 Union St., Bangor, ME 04401 with a nameplate capacity of approximately 1.9 MW. Union Street Solar, LLC is subject to certain loan

#18676920v9

payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

k.  *Marshfield Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 10 Northfield Road, Marshfield, ME 04654 with a nameplate capacity of approximately 1.9 MW. Marshfield Solar, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

l.  *Belfast PV, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at 234 Belmont Avenue, Belfast, ME 04915 with a nameplate capacity of approximately 2.5 MW. Belfast PV, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

m.  *Oxford Solar, LLC* is a Delaware Limited Liability Company authorized to conduct business in the State of Maine, which owns, manages, and operates a DGR located at Main Street, Oxford, ME 04270 with a nameplate capacity of approximately 1.6 MW. Oxford Solar, LLC is subject to certain loan payment obligations and other loan covenants with respect to a loan it obtained to finance its DGR.

**The Syncarpha Plaintiffs**

19.  The following Plaintiff entities are ultimately owned and/or controlled by non-party Syncarpha Capital, LLC ("Syncarpha"):

### i. The Syncarpha Obligor Plaintiffs

a. *SPME Finance ME I, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance DGRs owned by three of the Syncarpha KWH Plaintiffs. SPME Finance ME I, LLC has also pledged its equity interest in the tax equity partnership that owns those three Syncarpha KWH Plaintiffs as collateral for its loan obligations.

b. *SPME Finance ME II, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance DGRs owned by two of the Syncarpha KWH Plaintiffs. SPME Finance ME II, LLC has also pledged its equity interest in the tax equity partnership that owns those two Syncarpha KWH Plaintiffs as collateral for its loan obligations.

c. *SPME Finance ME III, LLC* is a Delaware Limited Liability Company that is subject to certain loan payment obligations and other loan covenants with respect to loan(s) obtained to finance a DGR owned by one of the Syncarpha KWH Plaintiffs. SPME Finance ME I, LLC has also pledged its equity interest in the tax equity partnership that owns that one Syncarpha KWH Plaintiff as collateral for its loan obligations.

### ii. The Syncarpha KWH Plaintiffs

a. *Belfast Solar I, LLC* is a Maine Limited Liability Company, which owns, manages, and operates a DGR located at 205 North Pond Road (Congress Street), Belfast, ME 04915 with a nameplate capacity of approximately 3.5 MW.

#18676920v9

   b.   *Edgecomb Solar I, LLC* is a Maine Limited Liability Company, which owns,

        manages, and operates a DGR located at 17A Dodge Road, Edgecomb, ME 04556

        with a nameplate capacity of approximately 4.9 MW.

   c.   *Readfield Solar I, LLC* is a Maine Limited Liability Company, which owns,

        manages, and operates a DGR located at 368 Main Street, Readfield, ME 04355

        with a nameplate capacity of approximately 4.9 MW.

   d.   *Riverside Solar, LLC* is a Maine Limited Liability Company, which owns,

        manages, and operates a DGR located at Riverside Drive, Augusta, ME 04330

        with a nameplate capacity of approximately 4.9 MW.

   e.   *Waldoboro Solar I, LLC* is a Maine Limited Liability Company, which owns,

        manages, and operates a DGR located at Controversy Lane, Waldoboro, ME

        04572 with a nameplate capacity of approximately 4.9 MW.

   f.   *Wiscasset Solar I, LLC* is a Maine Limited Liability Company, which owns,

        manages, and operates a DGR located at 25 Jones Road, Wiscasset, ME 04578

        with a nameplate capacity of approximately 4.9 MW.

**The Defendants**

20.    The Maine Public Utilities Commission ("PUC") is an independent Maine state

agency established pursuant to 35-A M.R.S. § 103, with authority to administer and enforce the

legal requirements of Maine's NEB Program, such as the provisions of 35-A M.R.S. §§ 3209-A-

3209-I (including those provisions implemented by LD 1777) and the PUC's NEB Program rules.

21.    Chairman Bartlett serves as the Chairman of the PUC, and Commissioners Scully

and Gilbert serve as Commissioners of the PUC. Plaintiffs bring this action against Chairman

Barlett and Commissioners Scully and Gilbert in their respective official capacities, as Maine law

#18676920v9

charges each with authority to administer and enforce the legal requirements of Maine's NEB Program.

## JURISDICTION AND VENUE

22.    The Court may exercise subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, as well as under 42 U.S.C. § 1983, because this action arises under the laws of the United States, seeks to redress the deprivation, under color of State law, of rights, privileges, or immunities secured by the Constitution of the United States, and seeks to secure equitable and declaratory relief with respect to the protection of civil rights.

23.    The Court may exercise personal jurisdiction over the PUC because it is a Maine state agency operating within the State of Maine.

24.    The Court may exercise personal jurisdiction over Chairman Bartlett and Commissioners Scully and Gilbert because each resides within the State of Maine and serves as a Commissioner of the PUC, which operates within the State of Maine.

25.    The United States District Court for the District of Maine is the appropriate venue for this action under 28 U.S.C. § 1391 because it is a judicial district where the Defendants reside and where a substantial part of the events giving rise to the claims occurred.

## FACTS

### I.    Maine's NEB Program: An Introduction

26.    In 2019, Governor Janet T. Mills signed into law LD 91, "An Act to Eliminate Gross Metering." The law—which updated and reformed Maine's NEB Program—reversed Maine's previous policy of undervaluing clean energy generated by solar panel operators and supplied to Maine's electrical grid.

#18676920v9

27.     As established by LD 91, and as codified in various provisions of Title 35-A

M.R.S., chapter 32, sections 3209-A through 3209-I, Maine's NEB Program allows electric

utility customers to be billed on a net basis—in other words, by billing the customers for the net

difference between the energy they generate and the energy they use.

28.     In the NEB Program's most basic application, a homeowner installs solar panels

on the roof of her home. The home remains connected to the electrical grid via a bi-directional

meter. The homeowner's solar panel array generates energy that is used to power the home

during daylight, and any energy generated by the panels that exceeds the needs of the home is

delivered to the electrical grid. During periods when the solar array is producing excess energy,

the homeowner's meter measures the number of kilowatt hours ("kWh") of solar energy

delivered to the grid.

29.     During periods when the solar panels cannot produce enough energy to sustain

the home—such as at night or on cloudy days—the home draws energy from the grid. During

these periods, the homeowner's meter measures the kWh of energy delivered from the grid to the

home.

30.     At the end of the billing cycle, the homeowner receives a bill credit equivalent to

one kWh of grid electricity for every one kWh of excess solar energy delivered to the grid. These

credits are first applied to the customer's bill for the month, such that the customer is billed only

for the net difference between the kWh of energy her solar panels delivered to the grid during the

billing period and the kWh of energy her home drew from the grid during that period. For

example, if the home drew 1000 kWh from the grid and delivered 500 kWh to the grid, the

homeowner is billed for only 500 kWh of electricity.

43

31.     If the homeowner's solar array delivered *more* energy to the grid during the billing period than her home drew from the grid—such that the customer's entire grid electricity usage is offset by her delivery of solar to the grid—the customer will receive excess bill credits. For example, if the home drew 1000 kWh from the grid and delivered 1500 kWh to the grid, the homeowner will receive 500 kWh of excess credits. The customer may bank these credits for up to a year and use them to offset her grid electricity usage in later months where her solar energy delivered may be less than the grid electricity received.

32.     A homeowner investing in a rooftop solar array will typically seek to size the solar array so that, over the course of the year, it offsets her entire grid electricity usage with solar energy. This means installing a solar array that produces slightly more energy than needed in the summer months (when the sun is shining brightly for more hours) and slightly less energy than needed in the winter months (when the days are shorter and clouds are more frequent). The NEB Program essentially allows the homeowner to use the grid as an energy storage bank—in which she can bank her excess summer energy production for use in the winter—without having to install storage batteries or other expensive equipment.

33.     Purchasing and installing solar panels requires a significant upfront investment, but an individual solar panel owner who participates in the NEB Program can expect to recover the costs of the installed solar panels over time via reduced monthly electric bills, and to ultimately see a return on her investment once the cost of the solar panels has been recouped.

**II. The NEB Program and Community Solar**

34.     Not everyone can install solar panels on their roofs. Renters and residents of multifamily buildings are typically unable to modify the exteriors of their homes, and low-income individuals often lack the means to make an upfront investment in or obtain financing for

#18676920v9

solar panels. Zoning regulations, HOA restrictions, roof size constraints, and the presence of shade also can make the installation of solar panels impractical or impossible for many individuals, families, and businesses.

35.     Maine's NEB Program therefore was designed to encourage the development of community solar projects. A community solar project begins with a project sponsor who—much like the homeowner in the example above—makes a significant upfront investment by building or purchasing a DGR. In the Maine community solar context, however, a DGR is a large-scale solar array mounted in the ground which may be located anywhere within Maine and need not be "co-located" with a home, such as in the case of a rooftop solar array. *See* 35-A M.R.S. §§ 3209-A(1)(B); 3210(2)(B-3) (noting that a DGR may be located anywhere within "in the service territory of a transmission and distribution utility in the State").

36.     Unlike the homeowner who primarily generates solar energy to power her own home and delivers only her excess energy to the grid, the DGR delivers essentially all of the electricity it generates directly to the electrical grid, with the exception of the power it uses to serve its own *de minimis* needs.

37.     Like the homeowner example above, each kWh of electricity a DGR enrolled in the NEB Program delivers to the electrical grid generates a credit. However, unlike an individual homeowner, the project sponsor does not use the credits it generates to offset its own electric bills, which are minimal. Instead, residential or commercial utility customers may subscribe to the community solar project by agreeing to purchase a share of the monthly credits generated by the DGR, which such share generally will approximate the customer's annual energy usage. *See* 35-A M.R.S. § 3209-A(3) (allowing "[m]ultiple customers of an investor-owned transmission and distribution utility that have distinct billing accounts with that utility" to "share a financial

45

interest in a distributed generation resource"); 35-A M.R.S. § 3209-B(4) (same). The customers then use their shares of the credits generated by the DGR to offset their own electric bills.

38.     There is no upfront cost to the customer to participate in a community solar project—instead, each customer agrees to pay the project sponsor a fixed percentage of the monetary value of the credits he receives each month. For example, if the customer agrees to pay the project sponsor 85% of the value of his share of the credits generated by the DGR, and the customer's share then generates credits worth $100 in a month, the customer will pay the project sponsor $85 in exchange for $100 worth of savings on his electric bill. The customer therefore receives a net discount of 15% of his energy costs, and the project sponsor is paid 85% of the value of the credits generated by the DGR. Maine's NEB Program thus directly lowers electric bills for its customers.

39.     This structure allows a project sponsor to shoulder the upfront investment in solar panels, transformers, inverters, and racking equipment that would otherwise be borne by the homeowner, and to do so on a larger scale.

40.     Maine's NEB Program created two different types of community solar programs applicable to two different classes of customers with differing needs: the kWh Credit Program and the Tariff Rate Program. A community solar project that meets certain statutory requirements may participate in one of these program. *See* 35-A M.R.S. §§ 3209-A(7)-(9) (kWh Credit Program statutory requirements); 35-A M.R.S. § 3209-B(9) (Tariff Rate Program).

**a. The kWh Credit Program**

41.     The first type of community solar program under the NEB Program—known as the "kWh Credit Program," 35-A M.R.S. § 3209-A—is available to all customers of a Maine transmission and distribution utility, and allows a subscriber to a community solar project to

#18676920v9

receive a one-to-one credit on the volumetric billing determinants (i.e., based on kWh energy usage) of his electricity bills for each kWh of energy generated by his share of the DGR's energy output, just like a homeowner receives a one-to-one credit for each kWh of excess energy delivered to the grid.

42.    For example, if a residential subscriber uses 1000 kWh of grid electricity in a month, and his share of the community solar project generates 500 kWh of energy, the subscriber will be billed by the applicable utility for only 500 kWh of electricity (plus a monthly customer charge). And, if the subscriber's share of the community solar project exceeds his grid electricity use for the month, the subscriber can bank his excess credits for up to a year, and apply the credits in months where solar generation is lower.

43.    The subscriber then will receive a separate bill from the project sponsor for the credits generated that month. As noted above, the bill will be for some fixed percentage of the value of the credits the subscriber received. The amount the subscriber pays to the project sponsor therefore always will be some fixed percentage less than the value of the credits the subscriber receives.

44.    A subscriber to a kWh Credit Program project will never have an electricity bill of zero dollars even if his kWh credits completely offset his energy usage; the subscriber still must pay a minimum delivery charge and, if applicable, a demand charge, both of which are charged by the relevant transmission and distribution utility. Nevertheless, a subscriber will realize significant savings on his monthly electricity bill.

45.    The NEB Program sets the monetary value of the kWh credits generated by a DGR participating in the kWh Credit Program by treating each kWh of solar energy delivered to the grid as a one-to-one equivalent of a kWh of grid electricity. *See* 35-A M.R.S. § 3209-

47

A(1)(C). In other words, the project sponsor of a DGR enrolled in the kWh Credit Program can be certain that the value it will receive for a credit generated by that DGR will be some fixed percentage of the retail value of a kWh of grid electricity.

46.     The mechanics of the kWh Credit Program are reflected in the diagram below:



*See* Maine Off. Of the Pub. Advocate, *Community Solar* (last visited November 20, 2025), https://www.maine.gov/meopa/electricity/renewable-energy/community_solar.

**b. The Tariff Rate Program**

47.     The second type of community solar project created by the NEB Program—known as the "Tariff Rate Program," 35-A M.R.S. § 3209-B—is available only to non-residential utility customers. *See id.* ("The [PUC] shall establish by rule, in accordance with this section, a net energy billing program for commercial and institutional customers of investor-owned utilities.").

48.     The Tariff Rate Program is designed specifically for commercial and industrial users of energy, such as grocery stores, hospitals, and manufacturing facilities. These users typically pay high demand charges (based on their highest hourly electricity usage in a month or

a year) to the utilities to account for the fixed costs needed to service their peak demand. Under the kWh program, these high demand charges would be present even if a non-residential customer purchased enough kWh credits to completely negate the charges on its utility bill for kWh of energy used.

49.     The Tariff Rate Program therefore provides non-residential subscribers to a community solar project with a monetary credit for each kWh of energy generated by the customers' shares of the community solar project. *See* 35-A M.R.S. § 3209-B(5). The value of the credit—the "tariff rate"—is determined annually by the PUC pursuant to a formula set by statute and based off the applicable grid electricity rate plus a percentage of the applicable transmission and distribution rate. *Id.*

50.     These credits—reflected on the subscriber's bill not in terms of kWh of electricity, but instead as a dollar amount—can be applied towards both the charges for kWh of energy consumed and towards the demand and delivery charges on the non-residential customer's utility bill. *See id.* § 3209-B(5)(C) ("A bill credit under the program . . . may be applied to any portion of a customer's electricity bill."). A subscriber to a tariff rate project can bring its bill down to zero by applying its monetary credits to the full amount of its bill. The dollar credits may also be banked for up to a year.

51.     A subscriber to a tariff rate project therefore will receive a bill from its utility from which the total amount—charges for energy delivery, supply, and demand—is offset by the dollar amount of that subscriber's bill credits. The subscriber will then receive a separate bill from the project sponsor for the credits generated that month. Again, the bill will be for some fixed percentage of the dollar credits the subscriber received.

#18676920v9

52.     As with the kWh Credit Program, the project sponsor of a DGR enrolled in the Tariff Rate Program can be certain that the value it receives for a credit generated by that DGR will be some fixed percentage of the tariff rate. While the Legislature has adjusted the calculation of the tariff rate over time (and has, over time, limited who could participate in the Tariff Rate Program), these changes were applied gradually, and, in the instance of the limits on the program, grandfathered in with respect to those projects already participating in the program.

53.     Moreover, the Legislature has specified by statute that a subscriber to a community solar project enrolled in the Tariff Rate Program "who remains eligible to participate in the program must be allowed to receive a bill credit based on the tariff rate"—as specified by statute—"for a period of no less than 20 years from the date of first receiving the credit." *Id.* § 3209-B(5)(D). The PUC has expanded this concept, noting that project sponsors may form NEB agreements with the relevant transmission and distribution utility for twenty years. *See* 65-407 C.M.R. ch. 313, § 3(M). As a result of these provisions, Tariff Rate Project subscribers and project sponsors typically enter into twenty-year credit purchase and sale agreements.

### III. The Substantial Benefits of Community Solar

54.     Governor Mills recognized the benefits of solar energy when she signed into law the bill establishing the NEB Program, stating that the law would "reset[] Maine's solar policy[] and chart[] the course for the growth of solar power to lower electricity bills and combat climate change." *See* Off. of Gov. Janet T. Mills, *Governor Mills Signs Legislation to Restore Net Metering & Incentivize Growth of Solar Power in Maine* (Apr. 2, 2019), https://www.maine.gov/governor/mills/news/governor-mills-signs-legislation-restore-net-metering-incentivize-growth-solar-power-maine.

50

55.     The Legislature also made Maine's interest in "encouraging the development of solar energy generation" abundantly clear. 35-A M.R.S. § 3474. Specifically, the Legislature has found and determined that "[t]he solar energy resources of the State constitute a valuable indigenous and renewable energy resource," and "solar energy development, which is unique in its benefits to and impacts on the climate and the natural environment, can make a contribution to the general welfare of the citizens of the State" because it "is an energy resource that does not rely on fossil fuel combustion and therefore it can displace energy provided by that source and reduce air pollution and greenhouse gas emissions." *Id.* § 3472. The Legislature further has found and determined that "[t]here is an inexhaustible supply of solar energy throughout the State that should be used cost-effectively for heat and electricity using current technology." *Id.* The Legislature therefore has established that "[i]t is the policy of the State . . . to encourage the attraction of appropriately sited development related to solar energy generation." *Id.* § 3472.

56.     The positive environmental benefit of solar energy generation cannot be overstated. The generation of energy by burning fossil fuels (such as coal, oil, and natural gas) is the world's largest source of greenhouse gases, which trap heat in the Earth's atmosphere and thereby cause the planet to warm. *See* United Nations Climate Action, *Renewable energy – powering a safer and prosperous future* (last visited Nov. 20, 2025), https://www.un.org/en/climatechange/raising-ambition/renewable-energy. Experts agree that to avoid the worst aspects of climate change, emissions of fossil fuel must be reduced by half by 2030, and reach net-zero by 2050. *Id.*

57.     Fossil fuels are not only unhealthy for the Earth as a whole, they are also unhealthy for individuals. The burning of fossil fuels is the main source of the fine particulate matter and nitrogen dioxide that pollutes the earth's air. *Id.* Air pollution is associated with 7

51

million premature deaths each year, and the economic health damages caused by air pollution totals $8.1 trillion a year. *Id.*

58.    Solar panels, on the other hand, generate energy from the sun's rays and therefore do not require the burning of any fossil fuel. Solar panels emit no greenhouse gases during their operation, and therefore do not contribute to global climate change or air pollution, making solar a healthier form of energy for both individuals and the earth as a whole. *Id.*

59.    Solar energy is also available everywhere. *Id.* Countries that increase the amount of energy they obtain from the sun's rays are able to decrease their dependence on other countries' exportation of fossil fuels, protecting themselves from unpredictable swings in fossil fuel prices while driving economic growth and reducing overall geopolitical tension. *Id.*

60.    Community solar in particular—including the two forms of community solar projects created by Maine's NEB Program—plays an important role in solar energy development, because it increases access to the benefits of solar energy to individuals and businesses who face barriers to installing rooftop solar panels of their own. By participating in the community solar model, these individuals and business can obtain the core benefits of solar energy: clean, renewable energy at a reduced cost.

61.    Community solar also benefits even those Maine ratepayers who do not themselves subscribe to a community solar project. Most notably, this is because "the NEB programs have environmental benefits," and "all ratepayers benefit from state policies on climate change." *Indus. Energy Consumer Grp. v. Pub. Utilities Comm'n*, 2024 ME 60, ¶ 35 n. 7, 320 A.3d 437.

62.    Community solar also has a positive impact on Maine ratepayers beyond its obvious environmental, health, and economic benefits. At a time of rising energy prices and

skyrocketing energy demand, there is a need for all types of energy. Solar energy is one of the fastest types of energy to deploy.

63.     When interconnecting a DGR to the grid, the project sponsor is typically required to fund system upgrades to the electricity distribution or transmission system to facilitate such interconnection. *See* Sustainable Energy Advantage, LLC (Prepared for Me. Pub. Util. Comm'n), *Analysis of 2023 Net Benefits of Net Energy Billing Program* (Apr. 1, 2024) at 12-13, available at: https://www.maine.gov/mpuc/sites/maine.gov.mpuc/files/inline-files/NEB-Y2023_CBA-LD%201986.pdf. These upgrades—which make the grid more reliable for all users—otherwise would have been paid for by the utilities (with the costs passed on to ratepayers) in the normal course of business. Instead, project sponsors, like Plaintiffs, shoulder the multi-millions of dollars needed for such upgrades.

64.     Additionally, community solar projects increase the overall resilience of the electricity grid. By increasing the numbers of smaller, geographically disbursed energy generators, the grid is less reliant on large, centralized power plants. In the event a centralized power plant is disrupted, such as by a weather event, the grid can rely on energy provided by community solar arrays. *See* U.S. Dept. of Energy, *Community Solar Basics* (last visited Nov. 20, 2025), https://www.energy.gov/eere/solar/community-solar-basics#:~:text=Community%20solar%20can%20allow%20all,meaningful%20benefits%20of%20community%20solar. This both protects ratepayers from losing power during storms and other weather events and reduces the need for utilities to invest (at the ratepayers' expense) in diversifying the geographic locations of their power plants.

65.     The dispersed nature of community solar projects reduces demand on the grid by allowing energy to travel a short distance to reach its ultimate consumer. This, again, can delay

or potentially eliminate for grid upgrades, leading to reduced transmission and distribution costs for ratepayers.

66.     Community solar projects participating in the NEB Program do not increase the cost of transmitting or distributing electricity to ratepayers. Indeed, community solar projects lower transmission and distribution costs because of the grid upgrades and interconnection fees for which they pay. What some have wrongly described as a cost of the NEB Program in the form of marginally higher retail rates is only cost shifting, not an increase in overall costs. The retail electricity rate consists of the cost of power generation plus the cost of delivering that power, and the latter includes the fixed costs of maintaining the power delivery system. A net energy billing program that, like Maine's NEB Program, allows a subscriber to obtain a credit equivalent to the full amount of the retail cost of generating and delivering a kWh of standard electricity necessarily will give that subscriber a discount as to the cost of maintaining the power delivery system, despite the fact that the subscriber continues to use that delivery system. While this discount is minimal for subscribers to community solar projects enrolled in the kWh Credit Program—where subscribers still pay monthly minimum delivery charges on their energy bills— it is more pronounced in the tariff rate program, where subscribers can use their monetary credits to offset their entire energy bills. The utility is then required to make up the difference somewhere, and the result is incrementally higher distribution costs for some ratepayers.

67.     In March 2025, just months before LD 1777 was passed, the PUC published a study it commissioned, pursuant to Maine statute, analyzing the costs and benefits of the NEB Program. The study concluded that the benefits of kWh Credit Program outweighed its costs. *See* Sustainable Energy Advantage, LLC (Prepared for Me. Pub. Util. Comm'n), *Analysis of 2024 Net Benefits of Net Energy Billing Program* (Mar. 31, 2025) at 32-33, available at:

54

https://www.maine.gov/mpuc/sites/maine.gov.mpuc/files/inline-files/Maine-NEB-Y2024_CBA_Final.pdf. Specifically, the study found that the societal benefits of the kWh Credit Program for community solar projects (described in the report as "front-of-meter" or "FTM") outweighed any costs of the program by a ratio of 1 to 1:08, meaning for every dollar spent on the program, society received benefits equivalent to $1.08. *Id.* at 32. In other words, the kWh Credit Program essentially pays itself (and then some) via the benefits provided to society in the form of reduced greenhouse gas emissions, impact on energy supply costs, distribution upgrades, and other relevant factors.

**IV. The Plaintiffs' Investment in Community Solar**

68.    The NEB Program assured project sponsors—including the Tariff Rate Plaintiffs and the KWH Plaintiffs—that, if they met certain statutory requirements, they would be entitled to participate in the NEB Program and to therefore obtain value for the solar energy their DGRs generated commensurate with their significant investment in those DGRs and the associated costs of operating a community solar project.

69.    In reliance on this assurance, the Plaintiffs invested significant resources into community solar projects in Maine.

70.    None of the significant investment and debt financing undertaken by the Plaintiffs to pay for the substantial costs of creating their large-scale DGRs—and thus, resulting benefits to subscribers, ratepayers, and Maine generally—would have been possible but for the anticipated revenue available to the Plaintiffs operating under the NEB Program. Put simply, Plaintiffs would not have built their DGRs in Maine absent the NEB Program and the financial arrangements it created.

#18676920v9

71.    To develop a DGR, a project sponsor first must secure a legal interest in the real property on which the DGR will be located, typically either by purchasing fee title to the land or by entering a lease or easement agreement with the landowner. The project sponsor also must obtain all state and local permits required to develop a DGR on the land. The Tariff Rate Plaintiffs and KWH Plaintiffs each have secured legal interests in the real property on which their DGRs are located, as well as the relevant permits for each such parcel of land.

72.    Next, the project sponsor must design, procure, and construct the DGR. This requires the project sponsor to: (1) design and implement any necessary improvements to the land itself; (2) procure power generation equipment, including photovoltaic ("PV") panels, mounting racks, tracker systems, inverters, and transformers; and (3) construct the power generation and energy storage equipment and associated facilities. Each Tariff Rate Plaintiff and KWH Plaintiff either designed, procured, and contracted for the construction of its DGR, or obtained its DGR from an entity that took such steps.

73.    Constructing a DGR requires attaching PV panels to racks or frames, which are then attached to ground-based mounting supports. These mounting supports are then attached to the ground, either by being driven directly into the ground or by being embedded into concrete slabs or poured concrete footing. Constructing a DGR is no different than constructing any other structure on land: doing so requires obtaining an interest in the land itself, laying a foundation, constructing racking, and finally installing the panels and wires that make the DGR function. Each of the DGRs owned by the Tariff Rate Plaintiffs and KWH Plaintiffs is securely affixed to the Plaintiffs' real property.

74.    A project sponsor also must obtain and maintain subscribers to its project. This requires marketing the community solar project to potential subscribers, entering into credit

#18676920v9

purchase and sale agreements with those subscribers, providing administrative support to those subscribers, and replacing any subscribers who cancel their subscriptions to the project. Project sponsors either market their projects directly to potential subscribers, or hire third-party contractors who charge significant fees to perform subscriber marketing, acquisition, and management services. Both options require the project sponsors to incur and pay expenses to obtain and maintain their subscribers. A project sponsor generally obtains subscribers before and/or during the construction of the DGR to ensure that the project is fully subscribed by the time the project reaches its commercial operation date. The Tariff Rate Plaintiffs and KWH Plaintiffs have all obtained subscribers to their community solar projects, and the vast majority of those subscribers have signed credit purchase and sale agreements fixing the monthly fee the subscriber must pay to the project sponsor (which, as described above, is a set percentage of the value of the credits received by the customer) for the next twenty years.

75.    Finally, a project sponsor must enter into both an interconnection service agreement and a net energy billing agreement with the applicable transmission and distribution utility.

76.    The interconnection agreement between the project sponsor and the utility allows the DGR to connect to the distribution system of the utility. As noted above, an interconnection agreement typically will require the project sponsor to bear the cost of interconnection facilities and distribution upgrades. Each Tariff Rate Plaintiff and KWH Plaintiff is a party to an interconnection agreement with the transmission and distribution utility servicing the area where the relevant DGR is located, and each Tariff Rate Plaintiff and KWH Plaintiff either itself paid interconnection costs to the relevant utility, or obtained its DGR from an entity that paid such costs.

77.     A net energy billing agreement is a contract between the project sponsor and the utility that formalizes the terms of the project sponsor's participation in the NEB Program. These agreements are standardized pursuant to Maine statute and PUC regulations, and, with respect to the tariff rate program, the PUC requires utilities to "allow project sponsors . . . to choose a contract with a term length of up to twenty years." *See* 65-407 C.M.R. ch. 313, § 3(M). Each Tariff Rate Plaintiff and KWH Plaintiff is a party to a net energy billing agreement for a twenty-year term with the relevant transmission and distribution utility.

78.     Once built, a DGR does not operate like a traditional business. It operates only by existing; it has no "business" hours (it is "open" whenever the sun is shining); and it has no employees. Thus, these DGR assets, once built and operational, act in all relevant respects like a bank account—used to collect revenue and pay down the debts discussed below.

### V. Financing the Community Solar Projects

79.     The cost to undertake the steps described above is substantial. In order to pay for the property interest in the land, the permitting, the DGR materials and construction, the customer acquisition costs, the interconnection costs, and the cost to negotiate agreements with the relevant utilities, a project sponsor typically must obtain financing for the project.

80.     Tax equity financing is a common means of financing community solar projects, at least in part. The tax code allows an equity owner of a renewable energy asset to claim a tax credit and highly-accelerated tax depreciation equal to a percentage of the value of the asset's eligible basis—typically the purchase price or fair market value of such asset. Accordingly, financial institutions and corporations with significant tax obligations will invest in solar projects as equity owners to receive the tax credits generated by those projects. The tax equity investor

typically will be entitled to substantially all of the tax attributes of the community solar project as well as certain cash distributions for a specified period of time.

81.     Community solar projects also commonly rely on debt financing, in combination with tax equity. Generally, a project sponsor will take out a construction loan to build a DGR and then, following the completion of construction and the beginning of commercial operation, refinance that construction loan into a permanent loan, which is repaid over a term of years.

82.     Permanent loans can take several forms. In some cases, the loans are "front leveraged," meaning the project-level entity that owns the DGR borrows the funds and owes the various covenants and obligations described below. In other instances, the permanent debt is "back leveraged," meaning the debt and the covenant obligations are incurred by a holding company that directly or indirectly owns interests in the project-level entity that owns the DGR. Back leveraged loans are often used to finance a bundle of several different community solar projects under one loan agreement.

83.     The terms of a permanent loan typically require that project revenues be used to pay project expenses and investor returns in a pre-determined priority. Broadly speaking, cash is required to be distributed in the following order: (1) payment of project operating expenses; (2) preferred and other cash distributions to tax equity investors if present[1]; (3) payment of lender expenses not constituting debt service; (4) payment of debt service to the lender; (5) funding any required cash reserves for the project, including reserves for debt service, maintenance expenses, and capital expenses; and (6) making distributions to the equity owners.

---

[1] These tax equity distributions may be relatively minor relative to overall cash flow, since tax equity investors obtain the bulk of their required returns from their share of tax depreciation and credits.

84.     In addition to the core requirement of making periodic loan payments, permanent loans also are characterized by strict covenants that restrict the project sponsors from changing material aspects of their projects (and thereby jeopardizing those projects' revenue streams). Every DGR enrolled in the kWh Credit Program and secured by permanent financing is subject to a financing covenant mandating that DGR to remain enrolled in the Maine NEB Program. Leaving the NEB Program thus would trigger an event of default.

85.     A permanent loan also typically imposes a financial covenant on the borrower known as a Debt Service Coverage Ratio ("DSCR"), which requires that cash flow over a certain period exceeds required debt service during that period by a certain ratio. In a typical permanent loan agreement, failure to comply with the required DSCR ratio constitutes an event of default. Plaintiff are required to maintain certain DSCR thresholds under their permanent financing agreements.

86.     The foregoing covenants are standard in the world of community solar financing. A Lender, who seeks to minimize its financial risk, will not loan money to finance a community solar project unless it can be assured the projects will maintain a steady income stream that will allow the borrower to make payments on the loans over a long-term commitment, here, generally, 20 years. In other words, a project sponsor would be unable to develop or acquire a community solar project without agreeing to the foregoing covenants.

87.     If a borrower of a permanent loan defaults on its obligations under the loan agreement, the loan agreement typically will give the lender a remedy that will allow it to take ownership or control of the relevant community solar project. Plaintiffs' permanent financing agreements state that, in an event of default, their lenders possess remedies allowing foreclosure on the Pledgor Plaintiffs' pledged interests and DGR assets, severing ownership chains and

60

transferring control or possession of the Plaintiffs' projects entirely—including their real property interests (*e.g.*, leases or fee interests).

88.     In a front-leveraged loan, an event of default typically allows the lender to foreclose upon the assets of the project-level entity—i.e., on the DGR itself (the physical assets) along with its associated contracts and property rights. These front-leveraged loans often require that any entity upstream from the project-level entity pledge its equity interest in the project-specific entity (or some intermediary entity) as collateral as well.

89.     In a back-leveraged loan, the collateral securing the debt will not necessarily be the DGR itself (e.g., assets and contract rights), but rather the borrower's downstream equity interest in some entity sitting upstream from the cash held by the borrower and from the entity (i.e., the project sponsor) that owns the DGR. Often, the pledgor will be an entity that sits directly above the borrower entity, which will pledge its membership interest in the borrower entity to the lender in the event of default. If an event of default occurs, the lender can foreclose upon the pledgor's management interest in the borrower entity. Because the borrower entity sits upstream from the owner of the DGR, such a foreclosure would sever the chain of ownership between the pledgor and the DGR.

90.     The vast majority of the DGRs owned and operated by the Tariff Rate Plaintiffs and the KWH Plaintiffs are subject to permanent debt financing.

91.     Specifically:

    a.  The Altus Tariff Rate Plaintiffs and KWH Plaintiffs are held in tax equity
        partnerships and also have back-leveraged permanent debt. The debt for one of
        the Altus Tariff Rate Plaintiffs is held by Altus Obligor Plaintiff APA Finance III
        Borrower, LLC, and Altus Pledgor Plaintiff APA Finance Borrower Holdings III,

LLC has pledged its membership interest in that borrower as collateral for the loan. The debt for all other Altus Tariff Rate Plaintiffs and KWH Plaintiffs is held by Altus Obligor Plaintiff APA Finance IV, LLC, and Altus Pledgor Plaintiff APA Finance Holdings IV, LLC has pledged its membership interest in that borrower as collateral for the loan.

b.  The CleanCapital KWH Plaintiff, Gorham Solar 1, LLC, is financed via front-leveraged permanent debt for which Gorham Solar 1, LLC has pledged its property and assets as collateral. Gorham Solar 1, LLC, is owned by a tax equity partnership.

c.  All of the Luminace Tariff Rate Plaintiffs and the Luminace KWH Plaintiffs are held in tax equity partnerships, and all of the Luminace Tariff Rate Plaintiffs and the majority of the Luminace KWM Plaintiffs and also have back-leveraged permanent debt. The debt of all of the Luminace Tariff Rate Plaintiffs and the majority of the Luminace KWH Plaintiffs is held by Luminace Obligor Plaintiff Luminace ABS-2024 Issuer, LLC, and Luminace Pledgor Plaintiff Arcturus 2023 Class B Member, LLC has pledged its interest in the tax equity partnership that owns the relevant Tariff Rate Plaintiffs and KWH Plaintiffs as collateral for the loan. Three of the Luminace KWH Plaintiffs—Downeast Solar, LLC, Hayworth Solar Partners, LLC, and Shining Solar Partners, LLC—do not yet have permanent financing, but are instead presently financed by a revolving construction debt facility for which Luminace Obligor Plaintiff Luminace Development Holdings 3, LLC is the borrower, and for which Luminace Pledgor

Plaintiff Luminace Development Holdings 2, LLC had pledged its equity interest in Luminace Development Holdings 3, LLC as collateral.

d.  All of the Nautilus KWH Plaintiffs and all but one of the Nautilus Tariff Rate Plaintiffs have tax equity financing (Nautilus Tariff Rate Plaintiff Sturgeon Town House Solar, LLC does not have tax equity financing), and all of the Nautilus KWH Plaintiffs and the Nautilus Tariff Rate Plaintiff have back-leveraged permanent debt. The permanent debt for four of the Nautilus Tariff Rate Plaintiffs and five of the Nautilus KWH Plaintiffs is held by Nautilus Obligor Plaintiff Nautilus Issuer 2022, LLC, and Nautilus Pledgor Plaintiff Nautilus Issuer 2022 Holdco, LLC has pledged its equity interest in Nautilus Issuer 2022, LLC as collateral for that loan. The permanent debt for two of the Nautilus Tariff Rate Plaintiffs and thirteen of the Nautilus KWH Plaintiffs is held jointly by Nautilus Obligor Plaintiffs Nautilus Term Transfer Holdco, LLC and Nautilus Solar Term Holdco, LLC, and Nautilus Pledgor Plaintiffs Nautilus Solar Devco Parent, LLC and Nautilus Solar Opco Parent, LLC have pledged their equity interests in Nautilus Term Transfer Holdco, LLC and Nautilus Solar Term Holdco, LLC, respectively, as collateral for that loan.

e.  The Nexamp Tariff Rate Plaintiffs and KWH Plaintiffs are held in tax equity partnerships, and also have permanent debt. The permanent debt for several Nexamp KWH Plaintiffs is held by Nexamp Obligor Plaintiff Vega Portfolio Holdings I, LLC, and Nexamp Pledgor Plaintiff Vega Portfolio Intermediate Holdings I, LLC has pledged its membership interest in that borrower as collateral for the loan. The permanent debt for the Nexamp Tariff Rate Plaintiff and several

Nexamp KWH Plaintiffs is held by Nexamp Obligor Plaintiff Vega Portfolio
Holdings II, LLC, and Nexamp Pledgor Plaintiff Vega Portfolio Intermediate
Holdings II, LLC has pledged its membership interest in that borrower as
collateral for the loan.

f.  The majority of the REA Tariff Rate Plaintiffs and KWH Plaintiffs have front-
leveraged permanent debt as well as tax equity financing. Three of the REA Tariff
Rate Plaintiffs have only front-leveraged debt, and REA Investments, LLC, has
pledged its downstream membership interests in those entities as collateral for
those loans, as have REA Pledgor Plaintiffs Route 3 China Parent LLC, and
Nutting Ridge 2023 Parent, LLC. Several of the REA Tariff Rate Plaintiffs and
KWH Plaintiffs have front-leveraged debt that is secured by a second layer of
back-leveraged debt, and REA Investments, LLC, has pledged its downstream
membership interests in those entities as collateral for both the back-leveraged
loans as well as several of the front-leveraged loans. The REA Pledgor Plaintiffs
have also pledged their interests in certain REA KWH Plaintiffs as collateral for
their front-leveraged loans.

g.  The Renewable Properties Tariff Rate Plaintiffs and KWH Plaintiffs each have
front-leveraged permanent debt for which each such Plaintiff has pledged its
property and assets as collateral. Each Plaintiff is also held under in a tax equity
partnership in an inverted lease structure—four of the Renewable Properties
KWH Plaintiffs are held directly by Renewable Properties Pledgor Plaintiff
RenewProp Lessor 5, LLC, one of the Renewable Properties Tariff Rate Plaintiffs
and one of the Renewable Properties KWH Plaintiffs is held directly by

64

Renewable Properties Pledgor Plaintiff RenewProp Lessor 7, LLC, and three of the Renewable Properties KWH Plaintiffs are held directly by Renewable Properties Pledgor Plaintiff RenewProp Lessor 9, LLC. With respect to each project-level, front-leveraged loan, the relevant lessor entity tax equity partner that directly and wholly owns the project-level entity has pledged its membership interest in the project-level entity as collateral for the loan.

h. All but one of the Summit Ridge Tariff Rate Plaintiffs and KWH Plaintiffs have front-leveraged permanent debt for which each such Plaintiff has pledged its property and assets as collateral. One Summit Ridge KWH Plaintiff—Gateway Solar, LLC—has front-leveraged construction debt for which it has pledged its assets as collateral. Each Summit Ridge Tariff Rate Plaintiff and KWH Plaintiff is wholly-owned by a corollary Summit Ridge Pledgor holding company that has pledged its equity interest in the relevant Summit Ridge Tariff Rate Plaintiff and KWH Plaintiff as collateral for the relevant Plaintiff's loan obligations. Each Summit Ridge Tariff Rate Plaintiff and KWH Plaintiff is also held upstream by a tax equity partnership.

i. The Syncarpha KWH Plaintiffs are held in tax equity partnerships and also have back-leveraged permanent debt. The permanent debt for each Syncarpha KHP Plaintiff is held by one of three Syncarpha Obligor Plaintiffs—SPME Finance ME I, LLC, SPME Finance ME II, LLC, or SPME Finance ME III, LLC, and each of these three Syncarpha Obligor Plaintiffs has also pledged its equity interest in a tax equity limited liability company that owns one or more Syncarpha KWH Plaintiffs as collateral for its loan.

65

92.     Two Plaintiff groups utilize a financing structure known as a sale-leaseback, in which the sponsor (or the parent or sole member of the sponsor) sells the DGR to a tax equity investor for fair market value, and the tax equity investor then leases the DGR back to the sponsor (via a lease) or the sponsor and its parent or sole member (via a master lease) for prepaid rent and periodic rent payments. The tax equity investor will retain the 100% value of the tax benefits attributable to the DGR, while the sponsor will retain the right to use and operate the project and receive the revenue from its operation (minus the rent payments). Sponsors (and, where applicable, parents or sole members of sponsors) in a sale-leaseback arrangement make financial covenants to their tax equity investors via the terms in their lease agreements (and, where applicable, "framework" and related agreements).

a.  Catalyze Tariff Rate Plaintiff SOL ME Augusta 13 York Farm, LLC is a party to a lease agreement with a lessor tax equity investor and is subject to certain payment obligations and other covenants to the tax equity investor. Catalyze Obligor Plaintiff Catalyze Pyrite 2023 Solar Portfolio, LLC is a party to a pledge agreement in favor of the tax equity investor. In the event of default, the tax equity investor may cancel the lease and take possession of Catalyze Tariff Rate Plaintiff SOL ME Augusta 13 York Farm, LLC's DGR, and foreclose upon Catalyze Obligor Plaintiff Catalyze Pyrite 2023 Solar Portfolio, LLC's membership interest in Catalyze Tariff Rate Plaintiff SOL ME Augusta 13 York Farm, LLC. Catalyze KWH Plaintiff ME Fort Fairfield, LLC  is a party to a lease agreement with a lessor tax equity investor and is subject to certain payment obligations and other covenants to the tax equity investor. Catalyze Obligor Catalyze Sapphire Holdings II, LLC is the Master Lessee to the lease agreement.

In the event of default, the tax equity investor may cancel the lease and take possession of Catalyze KWH Plaintiff ME Fort Fairfield, LLC's DGR. Catalyze KWH Plaintiff ME Sandy River LLC is a party to a lease agreement with a lessor tax equity investor and is subject to certain payment obligations and other covenants to the tax equity investor. Catalyze Obligor Plaintiff Catalyze Ruby 2021 Solar Portfolio, LLC is the Master Lessee to the lease agreement. In the event of default, the tax equity investor may cancel the lease and take possession of Catalyze KWH Plaintiff ME Sandy River LLC's DGR.

b. EDPR KWH Plaintiff EDPRNA DG Bristol I, LLC (f/k/a C2 Bristol I LLC) is a party to a lease agreement with a lessor tax equity investor and is subject to certain payment obligations and other covenants to the tax equity investor. EDPR Obligor Plaintiff Mohave Power Holdings, LLC is the Master Lessee to the lease agreement. In the event of default, the tax equity investor may cancel the lease and take possession of the EDPR Plaintiffs' DGR.

93. All of the above loans/payment obligations contain covenants requiring the relevant Tariff Rate Plaintiff or KWH Plaintiff to remain in the NEB Program or else trigger an event of default.

94. Nearly all of the Plaintiffs' loans/payment obligations contain covenants requiring the relevant Plaintiff to meet certain DSCR obligations or else trigger an event of default.

95. The Plaintiffs who incurred these obligations did so in reliance on the NEB Program's commitment that if the Tariff Rate Plaintiffs and KWH Plaintiffs met the statutory requirements for participation in the NEB Program, they could obtain bill credits at standardized,

appropriate rates. Those Plaintiffs relied upon these rates set by the NEB Program when determining whether they could meet the DSCR obligations imposed by the loan covenants.

96.     As the PUC and the Legislature know and understand: the financing arrangements and applicable loan covenants attendant to community solar project financing reflect the industry standard. In other words, these arrangements and covenants are part and parcel of the investments by which community solar projects come into existence. Project sponsors typically could not develop or own these projects, and therefore participate in the NEB Program, without them.

### VI: The Statutory Requirements

97.     The NEB Program explains that a community solar project that meets the statutory requirements to participate in the Tariff Rate Program or the kWh Credit Program may participate in that program. *See* 35-A M.R.S. § 3209-A(7), (9) (kWh Credit Program); *see also* 35-A M.R.S. § 3209-B(7) (Tariff Rate Program).

98.     In reliance on this statutory language, and in addition to securing financing for their DGRs, the Tariff Rate Plaintiffs and the KWH Plaintiffs each took all steps necessary to meet the statutory and regulatory requirements for participation in the NEB Program.

99.     Specifically, each Tariff Rate Plaintiff took the following steps:

    a.  Acquired or obtained an interest in a DGR—that is, in an electrical generating facility that uses renewable fuel or technology (here, solar power) and is located in the service territory of a Maine transmission and distribution utility—with a nameplate capacity of less than 5 megawatts; *see* 35-A M.R.S. § 3209-B(1)(C), 3; *see also* 65-407 C.M.R. ch. 313, § 2(J);

b.  For each DGR with a nameplate capacity of greater than 2 megawatts and not more than 5 megawatts, met the following requirements; *see* 35-A M.R.S. §§ 3209-B(7), 3209-A(7):

    i.  On or before December 31, 2020, obtained either: (1) a signed interconnection agreement with the relevant distribution utility governing the connection of the DGR to the utility's system and the ongoing operation of the DGR after it is connected to the system, or (2) a net energy billing agreement with the relevant transmission and distribution utility;

    ii.  On or before April 30, 2021, either (1) submitted a complete application for a customer net energy billing agreement for the DGR for which a customer/customers had a financial interest in 90% or more of the nameplate capacity, or (2) obtained a fully executed net energy billing agreement with the relevant transmission and distribution utility for the DGR for which a customer/customers had a financial interest in 90% or more of the nameplate capacity;

    iii.  On or before June 1, 2021, commenced the interconnection study process for any such DGR located in those portions of the service territory of an investor-owned transmission and distribution utility that are not connected to the ISO-NE region;

    iv.  On or before December 31, 2021, (1) obtained a fully executed interconnection agreement with the transmission and distribution utility; (2) certified to the PUC that it had submitted all applicable permit

applications to the Department of Environmental Protection and the department had accepted those applications for processing, and (3) certified to the commission that the entity has received all necessary local, nonministerial permits; and

v. On or before December 31, 2024, reached commercial operation by the date specified in the relevant net energy billing agreement or by the date specified with an allowable modification to that agreement;

c. For each DGR with a nameplate capacity of at least 1 megawatt and not more than 2 megawatts, met the following requirements; *see* 35-A M.R.S. §§ 3209-B(7); 3209-A(9):

i. On or before December 31, 2024, reached commercial operation by the date specified in the relevant net energy billing agreement or by the date specified with an allowable modification to that agreement;

d. Established a contact person responsible for all communications with the relevant transmission and distribution utility regarding the net energy billing agreement, and established timeframes for the exchange of information between that contact person and the relevant transmission and distribution utility in the applicable net energy billing agreement; *see* 65-407 C.M.R. ch. 313, § 3(B)(2).

100. Each KWH Plaintiff took the following steps:

a. Acquired or obtained a financial interest in a DGR—that is, in an electrical generating facility that uses renewable fuel or technology (here, solar power) and is located in the service territory of a Maine transmission and distribution utility—

70

with a nameplate capacity of less than 5 megawatts; *see* 35-A M.R.S. § 3209-A(1)(B), 4; *see also* 65-407 C.M.R. ch. 313, § 2(J);

b. For each DGR with a nameplate capacity of greater than 2 megawatts and not more than 5 megawatts, met the following requirements; *see* 35-A M.R.S. § 3209-A(7):

    i. On or before December 31, 2020, obtained either: (1) a signed interconnection agreement with the relevant distribution utility governing the connection of the DGR to the utility's system and the ongoing operation of the DGR after it is connected to the system, or (2) a net energy billing agreement with the relevant transmission and distribution utility;

    ii. On or before April 30, 2021, either (1) submitted a complete application for a customer net energy billing agreement for the DGR for which a customer/customers had a financial interest in 90% or more of the nameplate capacity, or (2) obtained a fully executed net energy billing agreement with the relevant transmission and distribution utility for the DGR for which a customer(s) had a financial interest in 90% or more of the nameplate capacity;

    iii. On or before June 1, 2021, commenced the interconnection study process for any such DGR located in those portions of the service territory of an investor-owned transmission and distribution utility that are not connected to the ISO-NE region;

iv.    On or before December 31, 2021, (1) obtained a fully executed interconnection agreement with the transmission and distribution utility; (2) certified to the PUC that it had submitted all applicable permit applications to the Department of Environmental Protection and the department had accepted those applications for processing, and (3) certified to the commission that the entity has received all necessary local, nonministerial permits; and

v.    On or before December 31, 2024, reached commercial operation by the date specified in the relevant net energy billing agreement or by the date specified with an allowable modification to that agreement;

c.    For each DGR with a nameplate capacity of at least 1 megawatt and not more than 2 megawatts, met the following requirements; *see* 35-A M.R.S. § 3209-A(9):

i.    On or before December 31, 2024, reached commercial operation by the date specified in the relevant net energy billing agreement or by the date specified with an allowable modification to that agreement;

d.    Established a contact person responsible for all communications with the relevant transmission and distribution utility regarding the net energy billing agreement, and established timeframes for the exchange of information between that contact person the relevant transmission and distribution utility in the applicable net energy billing agreement; *see* 65-407 C.M.R. ch. 313, § 3(B)(2).

## VII. LD 1777 and its Consequences

101.    By 2024, Maine was well on its way toward achieving the Legislature's stated policy goal of "[e]nsuring that solar electricity generation . . . meaningfully contributes to the

generation capacity of the State through increasing private investment in solar capacity in the State." 35-A M.R.S. § 3474.

102.    Between 2019 and 2025, Maine's community solar sector—as governed by the NEB Program—attracted over $800 million in private investment, powered more than 70,000 homes, and delivered an average of 15% monthly bill savings to subscribers.

103.    But after Maine had induced the flourishing array of community solar projects that it had sought, the Legislature enacted LD 1777, which upended the NEB Program and reneged on its bargain with the owners that had driven the development of solar power in Maine. *See* LD 1777 (132nd Legis., 1st Spec. Sess. 2025), attached hereto as **Exhibit A.**

104.    LD 1777—introduced in April of 2025 and signed into law in June of 2025— effectively ends the addition of new community solar projects to the NEB Program by prohibiting project sponsors from forming new net energy billing agreements with utilities after December 31, 2025. *See* LD 1777 §§ 2, 6. The legislation instead requires the Governor's Energy Office, now the Department of Energy Resources, to design a new program to encourage the development of community solar at some unspecified point in the future, and requires the PUC to implement the program only if it finds that the program "provide[s] benefits to ratepayers in the State in excess of the costs to ratepayers." *Id.* § 12.

105.    Beyond prohibiting new community solar projects from participating in the NEB Program, LD 1777 goes even further by changing fundamental aspects of both the Tariff Rate Program and the kWh Credit Program for current participants, thereby pulling the rug out from under the solar projects that Maine now enjoys.

106.    With respect to the Tariff Rate Program, LD 1777 changes the structure of the program by creating new, tiered tariff rate calculation formula that varies based on the nameplate

capacity of the subject DGR beginning January 1, 2026. *See* LD 1777 § 4. Under LD 1777, the tariff rate calculation will no longer be tied to retail electricity rates, and instead will cap rates at a fixed price with annual increases of 2.25%. This will result in a dramatic cut to the value of the tariff rate credits produced by projects serving large non-residential entities such as businesses, schools, and municipalities.

107.    With respect to the kWh Credit Program, LD 1777 imposes a new and unprecedented project charge on all DGRs enrolled in the kWh Credit Program with a nameplate capacity of one or more megawatts. Beginning on January 1, 2026, LD 1777 requires the PUC to establish a monthly project charge of $2.80 multiplied by the nameplate capacity of the DGR in kilowatts for any participating DGR with a nameplate capacity between 1 and 3 megawatts, and a monthly project charge of $6.00 multiplied by the nameplate capacity of the DGR in kilowatts for any participating DGR with a nameplate capacity between 3 and 5 megawatts. *See* LD 1777 § 9. The project charge must be paid by each DGR participating in the kWh Credit Program with a nameplate capacity between 1 and 5 megawatts to the utility with which the relevant DGR has a net energy billing agreement. *Id.* In other words, the project charge must be paid by the owner of the DGR to a private party.

108.    At the outset of the new statutory scheme created by LD 1777, the project charge imposed on kWh projects would range from $2,800 a month (or $33,600 a year) for a 1-megawatt project to $30,000 per month (or $360,000 per year) for a 5-megawatt project. This represents a massive change in the economics of projects that already have been purchased, financed, and contracted out for twenty years.

109.    The purported purpose of the project charge is to "offset distribution costs associated with net energy billing arrangements." LD 1777 § 9. But, as stated above, the NEB

Program does not increase total distribution costs; it only shifts them to some ratepayers, who nevertheless also share in the benefits of community solar projects. That the NEB Program does so is implicit in the design of the program and thus has been a known characteristic since the outset of the NEB Program in 2019.

110.    Despite the foregoing, Maine consistently promoted the NEB Program until it made an abrupt U-turn in the form of LD 1777.

111.    The significant project charge that KWH Plaintiffs will be required to pay as of January 1, 2026, is in addition to the net benefits KWH Plaintiffs already provide to society via their community solar projects.

112.    It is clear from the face of LD 1777 that the project charge does not confer any benefit on the KWH Plaintiffs; those Plaintiffs do not receive any new government benefit in exchange for the new project charge.

113.    The project charge is not based on a DGR's actual (and easily measurable) energy output. Instead, the project charge is based merely on the nameplate capacity of the DGR, meaning a DGR that was out of commission for a month would nevertheless be liable for thousands of dollars in project charges that month, despite not generating or distributing any energy that month.

114.    LD 1777's looming changes to the Tariff Rate Program and the kWh Credit Program threaten to pull the rug out from underneath the same community solar industry that Maine has spent years inducing and developing.

115.    Since 2019, the State has benefitted from the community solar industry's massive investment in building solar facilities. While, in 2018, Maine had only enough installed solar capacity to power roughly 10,000 homes, there are now enough solar panels in Maine to power

over 340,000 homes. *Compare* Office of Governor Janet T. Mills, *Governor Mills Signs Legislation to Restore Net Metering & Incentivize Growth of Solar Power in Maine* (Apr. 2, 2019), https://www.maine.gov/governor/mills/news/governor-mills-signs-legislation-restore-net-metering-incentivize-growth-solar-power-maine (noting 2018 installed solar capacity) with Solar Energy Industries Association, *ME Solar State Spotlight* (Sept. 2025) https://seia.org/wp-content/uploads/2025/09/Maine.pdf (noting 2025 installed solar capacity). The vast majority of this installed solar capacity has been funded by the community solar industry. *See ME Solar State Spotlight.*

116.    Yet now that those community solar projects are up and running—at the significant expense of the Plaintiffs, undertaken in reliance on the NEB Program—Maine has changed its tune and has drastically altered the bargain it struck with those Plaintiffs.

117.    This sudden about-face in policy is particularly egregious because the Plaintiffs cannot deploy their DGRs elsewhere. As discussed above, a DGR consists of solar panels that are driven into the ground or embedded into concrete. In other words, they are not movable. The Plaintiffs cannot simply pick up and move their DGRs to a state with a more favorable clean-energy policy. Had Maine originally created the program now contemplated by LD 1777, Plaintiffs would not have built their DGRs. Yet they now remain stuck with their DGRs, and with the loans they incurred to obtain them.

118.    Plaintiffs also do not have the option to simply leave the NEB Program and avoid the effects of LD 1777. Plaintiffs are contractually required by their financing agreements to maintain their status in the NEB Program. Attempting to leave the NEB Program will automatically trigger events of default, whereafter Plaintiffs stand to lose their interests in their DGRs entirely.

119.    Even if Plaintiffs were contractually permitted to leave, which they are not, certain Plaintiffs would be unable to satisfy their loan obligations in any alternative scenario selling their generated solar energy in the wholesale market, thus still triggering events of default, whereafter Plaintiffs still stand to lose their interests in their DGRs entirely. In forecasting the devastating economic consequences to LD 1777 in 2026:

a.    Plaintiffs conservatively forecast a net revenue collection rate of 85%. This figure combines both subscription rates with customers and collection rates from customers, both of which drive revenue.

b.    Plaintiffs assumed an NEB discount of 15% of the retail electricity rates for deriving the kWh credit prices, which is consistent with the discounts applicable in Plaintiffs' subscriber contracts.

c.    Plaintiffs used a capacity factor of 17.7% for a generic small solar photovoltaic generation plant in Maine, representing the median energy production estimate for a renewable energy project.

d.    Plaintiffs assumed a community solar management cost of $35 per kilowatt-direct current, accounting for costs related to resubscription, managing Plaintiffs' subscriber base, customer services, marketing, etc.

120.    Thus, Plaintiffs are coerced into staying in the NEB Program, which will still result in triggering events of defaults for certain Plaintiffs given the drastically changed economics driven by LD 1777.

## COUNT I

### U.S. Const. amend. V, XIV; 42 U.S.C. § 1983; 28 U.S.C. § 2201
### *Per se* Taking in Violation of the Fifth Amendment
### kWh Credit Program

121.    Plaintiffs incorporate all of the foregoing allegations as if set forth fully herein.

122.    The Takings Clause of the Fifth Amendment to the United States Constitution, as incorporated to the states by the Fourteenth Amendment, provides: "[N]or shall private property be taking for public use, without just compensation." U.S. Const. amend. V.

123.    The Fifth Amendment creates a constitutional right to just compensation when the government takes a person's property for public use.

124.    It is a violation of the United States Constitution for the government to condition a person's receipt of a benefit on that person's relinquishment of a constitutional right. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604, 614 (2013).

125.    In the context of the Fifth Amendment, where the government demands a monetary payment that burdens a person's interest in specific property, the demand constitutes an unconstitutional taking unless the government can prove a 'nexus' and 'rough proportionality' between the government's monetary demand and the ills sought to be addressed by the demand.

126.    LD 1777 results in an unconstitutional taking due to the project charge imposed on the KWH Plaintiffs.

127.    The project charge is a non-tax monetary extraction tied to the KWH Plaintiffs' use of their real property, because it is based on the characteristics of the DGR facilities physically attached to those real property parcels. The project charge thus burdens the KWH Plaintiffs' interests in specific parcels of land, such that the project charge would constitute a taking if it were directly required by the government.

78

128.    Defendants cannot establish an adequate nexus between the project charge and the purported societal ills LD 1777 seeks to address. While the project charge purports to address distribution costs associated with the NEB Program that are otherwise paid by ratepayers, the project charge is not linked to the KWH Plaintiffs' actual energy generation, and therefore lacks any link to the distribution costs it purports to address.

129.    The project charge is also not roughly proportional to the impact of the NEB Program on distribution costs, including because the benefits of the kWh Credit Program to all ratepayers outweigh the costs of the program, even in the absence of the project charge.

130.    The project charge therefore constitutes a taking of private property for public use without just compensation, as prohibited by the Fifth Amendment.

131.    In addition, the Takings Clause of the U.S. Constitution prohibits the government from appropriating a person's private property, including money, when that appropriation is not lawfully imposed as a tax or fee.

132.    The project charge is not reasonable because it is not imposed for the reimbursement of the cost of any benefit provided to the KWH Plaintiffs through the NEB Program.

133.    The project charge therefore constitutes a taking of private property for public use without just compensation, as prohibited by the Fifth Amendment.

134.    The KWH Plaintiffs, the Obligor Plaintiffs, and the Pledgor Plaintiffs will suffer immediate and irreparable harm by the enforcement of the project charge imposed by LD 1777.

135.    The KWH Plaintiffs, the Obligor Plaintiffs, and the Pledgor Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together,

#18676920v9

authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

## COUNT II

**U.S. Const. amend. V, XIV; 42 U.S.C. § 1983; 28 U.S.C. § 2201**
**Regulatory Taking in Violation of the Fifth Amendment**
**Tariff Rate and kWh Credit Program**

136. Plaintiffs incorporate all of the foregoing allegations as if set forth fully herein.

137. The Takings Clause also prohibits regulatory takings—that is, regulation that so restricts a person's property that justice and fairness require that compensation be given.

138. To assess whether a regulatory taking has occurred, the Court must make three inquiries: "(1) what is the economic impact of the regulation; (2) [does] the government action interferes with reasonable investment-backed expectations; and (3) what is the character of the government action." *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 33 (1st Cir. 2002) (quoting *Penn Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 124 (1978)).

139. The economic impact of LD 1777's proposed changes to the Tariff Rate Program and the kWh Credit Program is significant. The value of the Tariff Rate Plaintiffs and kWh Plaintiffs' property—that is, the parcels of real property and the DGRs affixed to that real property—is significantly diminished as a result of LD 1777.

140. LD 1777 interferes with reasonable investment backed expectations. Plaintiffs obtained financing with the reasonable expectation that they would be able to satisfy their loan covenants within the term of the loan. LD 1777 fatally threatens to disrupt the Plaintiffs' ability to satisfy those loan obligations.

141. The character of the government action is akin to a physical taking, because the government is essentially devaluing the electrons—themselves physical property—generated by

the regulated DGRs. Additionally, with respect to the KWH Plaintiffs, LD 1777's project charge is tied to the KWH Plaintiffs' use of their real property, because, as discussed above, it is based on the characteristics of the DGR facilities physically attached to those real property parcels.

142.     LD 1777's proposed changes to the Tariff Rate Program and the kWh Credit Program therefore constitute an unconstitutional regulatory taking of private property for public use without just compensation.

143.     Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

**COUNT III**

**U.S. Const. Art. 1, Sec. 10; 42 U.S.C. § 1983; 28 U.S.C. § 2201**
**Violation of the Contracts Clause**

144.     Plaintiffs incorporate all of the foregoing allegations as if set forth fully herein.

145.     The Contract Clause provides that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10, cl. 1. The Contract Clause "limits the power of the States to modify their own contracts as well as to regulate those between private parties." *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17 (1977).

146.     A two-step test governs whether a State has violated the Contract Clause. The first question is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978). The second question is whether the "[l]egislation adjusting the rights and responsibilities of contracting parties" is based "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *United States Trust Co.*, 431 U.S. at 22.

147.    Plaintiffs have net energy billing agreements with utilities and credit purchase and sale agreements with customers.

148.    LD 1777 substantially impairs Plaintiffs' contractual arrangements by "undermin[ing] [Plaintiffs'] contractual bargains, interfer[ing] with [Plaintiffs'] reasonable expectations, and prevent[ing] [Plaintiffs] from safeguarding or reinstating [their] rights." *Sveen v. Melin*, 584 U.S. 811, 819 (2018).

149.    As to the KWH Plaintiffs, LD 1777 "imposes a completely unexpected liability in potentially disabling amounts" for Obligor and Pledgor Plaintiffs. *Allied Structural Steel Co.*, 438 U.S. at 247. The KWH Plaintiffs entered into financing agreements based on the reasonable expectation that the NEB Program would allow them to meet the statutory requirements for participation in the NEB Program and therefore obtain bill credits at standardized rates. LD 1777 impairs the KWH Plaintiffs' contracts and, once in effect, will trigger events of defaults for certain KWH Plaintiffs.

150.    As to the Tariff Rate Plaintiffs, LD 1777 impairs their contractual obligations by altering the tariff rate under their contracts—a tariff rate that, by statute, customers were entitled to elect to receive for terms of up to 20 years. LD 1777 thereby upends "obligations in an area where the element of reliance was vital," namely the reasonable expectation of standardized rates and credit revenues. *Allied Structural Steel Co.*, 438 U.S. at 246. The Tariff Rate Plaintiffs entered into financing agreements based on the reasonable expectation that the NEB Program would allow them to meet the statutory requirements for participation in the NEB Program and therefore obtain bill credits at standardized rates. LD 1777 impairs the Tariff Rate Plaintiffs' contracts and, once in effect, will trigger events of defaults for certain Tariff Rate Plaintiffs.

151.    LD 1777 furthers no valid legislative purpose that could justify the drastic impairment of contractual obligations that LD 1777 inflicts.

152.    LD 1777 therefore violates the Contract Clause by substantially and unreasonably impairing Plaintiffs' contractual relationships.

153.    The Tariff Rate Plaintiffs, the KWH Plaintiffs, the Obligor Plaintiffs, and the Pledgor Plaintiffs bring this count pursuant to 42 U.S.C. §§ 1983 and 1988(b) and 28 U.S.C. §§ 2201-2202, which, together, authorize the Court to grant declaratory and injunctive relief, as well as to award attorneys' fees, to persons aggrieved by a state's violations of the United States Constitution.

#18676920v9

WHEREFORE, Plaintiffs pray the Court:

    a.   Enter judgment for the KWH Plaintiffs, the Obligor Plaintiffs, and/or the Pledgor Plaintiffs on Count I, declare LD 1777's project charge for kWh Credit Projects an unconstitutional taking under the Fifth Amendment to the United States Constitution, and permanently enjoin Defendants from assessing or enforcing said project charge;

    b.   Enter judgment for the Plaintiffs on Count II, declare LD 1777's proposed changes to the Tariff Rate Program an unconstitutional taking under the Fifth Amendment to the United States Constitution, and permanently enjoin Defendants from applying or enforcing said changes;

    c.   Enter judgment for the Plaintiffs on Count III, declare that LD 1777 violates the Contract Clause of the United States Constitution, and permanently enjoin Defendants from applying or enforcing LD 1777;

    d.   award Plaintiffs their reasonable attorneys' fees, in accordance with 42 U.S.C. §§ 1983 and 1988(b); and

    e.   award Plaintiffs any such other relief the Court deems just and appropriate.

#18676920v9

## <u>VERIFICATION OF THE ALTUS PLAINTIFFS</u>

  I, Gregg Felton, as the authorized agent of the Altus Plaintiffs, declare under penalty of perjury that the factual allegations in paragraphs 1-9, 20-91(a), and 93-153 in the foregoing Verified Complaint concerning the Altus Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the Altus Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the Altus Plaintiffs to make such records.

  Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025

              */s/Gregg Felton*
              Name: Gregg Felton
              Title: CEO, Altus Power, Inc.

## <u>VERIFICATION OF THE CATALYZE PLAINTIFFS</u>

I, Jared Haines, as the authorized agent of the Catalyze Plaintiffs, declare under penalty of perjury that the factual allegations in paragraphs 1-8, 10, 20-90, 92(a), and 93-153 in the foregoing Verified Complaint concerning the Catalyze Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the Catalyze Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the Catalyze Plaintiffs to make such records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025

_/s/Jared Haines_____

Name: Jared Haines
Title: CEO, Catalyze Holdings, LLC

## <u>VERIFICATION OF THE CLEANCAPITAL PLAINTIFFS</u>

I, Thomas Byrne, as the authorized agent of the CleanCapital Plaintiffs, declare under penalty of perjury that the factual allegations in paragraphs 1-8, 11, 20-90, 91(b), 93-98, 100-149, and 151-153 in the foregoing Verified Complaint concerning the CleanCapital Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the CleanCapital Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the CleanCapital Plaintiffs to make such records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025

_/s/Thomas Byrne_____
Name: Thomas Byrne
Title: CEO, CleanCapital Holdings, LLC

## <u>VERIFICATION OF THE EDPR PLAINTIFFS</u>

I, João Salvação Barreto, as the authorized agent of the EDPR Plaintiffs, declare under penalty of perjury that the factual allegations in paragraphs 1-8, 12, 20-90, 92(b), 93-98, 100-149, and 151-153 in the foregoing Verified Complaint concerning the EDPR Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the EDPR Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the EDPR Plaintiffs to make such records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025

*/s/João Salvação Barreto*

Name: João Salvação Barreto
Title: CEO, EDPR NA Distributed
Generation LLC

## <u>VERIFICATION OF THE LUMINACE PLAINTIFFS</u>

I, Declan McCarthy, as the authorized agent of the Luminace Plaintiffs, declare under penalty of perjury that the factual allegations in paragraphs 1-8, 13, 20-90, 91(c), and 93-153 in the foregoing Verified Complaint concerning the Luminace Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the Luminace Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the Luminace Plaintiffs to make such records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025


 */s/Declan McCarthy*
Name: Declan McCarthy
Title: CFO, Luminace Holdings, LLC

## <u>VERIFICATION OF THE NAUTILUS PLAINTIFFS</u>

I, Camelia Miu, as the authorized agent of the Nautilus Plaintiffs declare under penalty of perjury that the factual allegations in paragraphs 1-8, 14, 20-90, 91(d),and 93-153 in the foregoing Verified Complaint concerning the Nautilus Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the Nautilus Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the Nautilus Plaintiffs to make such records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025

*/s/Camelia Miu*

Name: Camelia Miu
Title: CFO, Nautilus Solar Energy, Inc.

#18652856v1

## <u>VERIFICATION OF THE NEXAMP PLAINTIFFS</u>

      I, Zaid Ashai, as the authorized agent of the Nexamp Plaintiffs, declare under penalty of perjury that the factual allegations in paragraphs 1-8, 15, 20-90, 91(e), and 93-153 in the foregoing Verified Complaint concerning the Nexamp Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the Nexamp Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the Nexamp Plaintiffs to make such records.

      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025

                                 */s/Zaid Ashai*

                                 Name: Zaid Ashai
                                 Title: CEO, Nexamp, Inc.

## <u>VERIFICATION OF THE REA PLAINTIFFS</u>

I, Mike Mills, as the authorized agent of the REA Plaintiffs, declare under penalty of perjury that the factual allegations in paragraphs 1-8, 16, 20-90, 91(f), and 93-153 in the foregoing Verified Complaint concerning the REA Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the REA Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the REA Plaintiffs to make such records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025

_/s/Mike Mills_____

Name: Mike Mills
Title: Manager, Renewable
Energy Alternatives, LLC and REA
Investments, LLC

## **VERIFICATION OF THE RENEWABLE PROPERTIES PLAINTIFFS**

I, Aaron Halimi, as the authorized agent of the Renewable Properties Plaintiffs, declare under penalty of perjury that the factual allegations in paragraphs 1-8, 17, 20-90, 91(g), and 93-153 in the foregoing Verified Complaint concerning the Renewable Properties Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the Renewable Properties Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the Renewable Properties Plaintiffs to make such records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025

*/s/Aaron Halimi*
Name: Aaron Halimi
Title: CEO, Renewable Properties, LLC

#18652822v1

93

## <u>VERIFICATION OF THE SUMMIT RIDGE PLAINTIFFS</u>

I, Adam Kuehne, as the authorized agent of the Summit Ridge Plaintiffs, declare under penalty of perjury that the factual allegations in paragraphs 1-8, 18, 20-90, 91(h), and 93-153 in the foregoing Verified Complaint concerning the Summit Ridge Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the Summit Ridge Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the Summit Ridge Plaintiffs to make such records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025

_/s/Adam Kuehne_____
Name: Adam Kuehne
Title: Executive V.P. and Chief Investment Officer, Summit Ridge Energy, LLC

## <u>VERIFICATION BY THE SYNCARPHA PLAINTIFFS</u>

I, Cliff Chapman, as the authorized agent of the Syncarpha Plaintiffs, declare under penalty of perjury that the factual allegations in paragraphs 1-8, 19-90, 91(i), 93-98, 100-149, and 151-153 in the foregoing Verified Complaint concerning the Syncarpha Plaintiffs are true and correct, based on my personal knowledge. Such personal knowledge includes information from records of the regularly conducted activities of the Syncarpha Plaintiffs made at or near the time of such activities by, or from information transmitted by, persons with knowledge, kept in the regular course of such activities, and of which it is the regular practice of the Syncarpha Plaintiffs to make such records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24, 2025

_/s/Cliff Chapman_____

Name: Cliff Chapman
Title: CEO, Syncarpha Capital, LLC

Dated:  November 24, 2025

/s/ *Nolan L. Reichl*
Nolan L. Reichl
Sara A. Murphy
Julia B. MacDonald
PIERCE ATWOOD LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Tel: (207) 791-1100
Fax: (207) 791-1350
nreichl@pierceatwood.com
smurphy@pierceatwood.com
jmacdonald@pierceatwood.com
*Attorneys for Plaintiffs*

Zachary C. Schauf (*pro hac vice* to be sought)
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 637-6351
zschauf@jenner.com
*Attorneys for Plaintiffs*

Ali I. Alsarraf (*pro hac vice* to be sought)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel: (312) 840-7376
aalsarraf@jenner.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Nolan Reichl, hereby certify that on November 24, 2025, true and correct copies of the

foregoing document were filed via email to the U.S. District Court at the following email address

MaineECFIntake@med.uscourts.gov.

I also sent courtesy copies of the foregoing document via email to the following:

Thomas Knowlton (Thomas.a.Knowlton@maine.gov)


Dated:  November 24, 2025          /s/ Nolan L. Reichl
                                   Nolan L. Reichl
                                   PIERCE ATWOOD LLP
                                   Merrill's Wharf
                                   254 Commercial Street
                                   Portland, ME 04101
                                   Tel: 207.791.1100
                                   nreichl@pierceatwood.com

                                   *Attorneys for Plaintiffs*