UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| GRAY YARMOUTH ROAD SOLAR LLC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:25-cv-00592-SDN |
| MAINE PUBLIC UTILITIES COMMISSION, et al., | ) ) ) | |
| Defendants. | ) ) | |

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

In this matter, over 140 organizations involved in community solar development (the "Plaintiffs") have sued the Maine Public Utilities Commission ("PUC") and various Commission officers (collectively, the "Defendants") over the implementation of Maine public law LD 1777, codified at 35-A M.R.S. § 3209-F. Specifically, Plaintiffs challenge LD 1777's "Project Charge," which is a monetary assessment charged to community solar developers participating in the State's Net Energy Billing ("NEB") Program. Plaintiffs argue that LD 1777 constitutes an unconstitutional per se taking of private property and request the Court enjoin enforcement of the law. On Friday, January 23, 2026, the Court held a hearing to address the Plaintiffs' pending motion for a preliminary injunction. For the reasons discussed herein, the Court now **DENIES** the Plaintiffs' motion.

## BACKGROUND

### I.        Energy Distribution Overview

Prior to discussing the NEB Program and the relevant statutory changes at issue here, an over-simplified explanation of energy distribution in Maine may be helpful. Solar power is often generated using resources such as solar installations or solar "farms."

These large-scale installations can be quite substantial, sometimes covering an area the size of multiple football fields. Private utility companies, also known as transmission and distribution utility companies, supply and distribute energy produced by energy producers, including both solar and all other types of energy.

Once collected, energy is delivered to consumers via the electrical grid. That task falls exclusively to the utility companies, which manage the "transmission"—the process of moving electricity across the broader grid—and "distribution"—the delivery of that electricity to individual homes and businesses over the local distribution system. The utility companies also are responsible for the physical infrastructure required for this movement of energy, including poles, wires, and substations. In addition, they perform ongoing maintenance and repairs, such as fixing power lines after severe storms.

The retail electricity rates charged to consumers are composed of two components: supply rates, which reflect the cost of generating energy, and delivery rates, which reflect the cost of delivering energy to homes and businesses for consumer use. Decl. Sally Zeh ("Zeh Dec."), ECF No. 33 at ¶¶ 10, 15. Delivery rates themselves are composed of both transmission and distribution rates, as described above. *Id*. at ¶ 16. Transmission rates are set by the Federal Energy Regulatory Commission, while distribution rates are set by the Defendant Maine PUC. *Id*. at ¶¶ 18, 20. Utility companies recover their transmission and distribution costs through both "fixed charges"—a set charge regardless of specific electricity usage—and "volumetric charges"—a variable charge based on the actual amount of a customer's electricity usage. *Id*. at ¶¶ 21–22.

## II.        History of NEB Program

The NEB Program is a state subsidy program designed to "encourage the adoption of small-scale, renewable energy generation" in the State of Maine. Decl. Heather Sanborn

("Sanborn Dec."), ECF No. 34 at ¶ 5. At its inception, the NEB Program allowed individual owners of qualifying renewable generation facilities (e.g., rooftop solar panels) to receive a one-kilowatt hour ("kWh") credit on their electric bill for every one kWh of energy supplied to the electrical grid. *Id.* ¶ 6. This one-to-one credit on NEB participants' utility bills is based solely on the energy produced and sent to the electrical grid. However, NEB participants do not pay any costs related to the utility company's transmission and distribution of the energy. *Id.* ¶ 9. This results in a "cost-shift" to non-NEB participants, whose utility rates are increased to recover the transmission and distribution costs the utility companies incur by delivering this energy. *Id.* Prior to 2019, NEB participants were almost entirely individual customers who owned small rooftop solar installations on their own residences. *Id.* at ¶ 10. The owners of these rooftop "facilities" received credits directly on their own utility bills and each facility had a limited capacity. *See id.* Because of the fewer number of participants and the limited capacity of their rooftop facilities, the initial "cost-shifting" impact of the NEB Program was relatively minor. *Id.*

In 2019, the Maine legislature reformed and significantly expanded the NEB Program by allowing larger "community solar" generators, such as Plaintiffs, to participate in the NEB Program through a similar "kWh credit program." *See id.* at ¶¶ 11–15. Under the kWh credit program, the owner of an eligible community solar generator (i.e., a "distributed generation resource" or "DGR")[1] contracts with individual "subscribers" so that a percentage of the electricity generated by the DGR is credited to each subscriber's utility bill, just as if a portion of the solar generator's panels were located

---

[1] The 2019 NEB Act defines "[d]istributed generation resource" or "DGR" as "an electric generating facility that uses a renewable fuel or technology . . . and is located in the service territory of a transmission and distribution utility in the State." 35-A M.R.S. § 3209-A(1)(B).

on the top of the subscriber's own roof. *See* Sanborn Dec. ¶ 13.[2] The kWh credit program differs from the original NEB Program in that individuals may now subscribe to and receive credits from a large-scale solar installation (i.e., a DGR) located elsewhere, rather than installing solar rooftops on their own residence.

To participate in the kWh credit program, subscribers pay the DGR directly, not the utility companies, for the value of their interest in the community solar facility. Zeh Dec. ¶ 44. In return, subscribers receive a credit for the energy the DGRs generate and are not charged any additional costs for transmission and distribution of that energy that the subscriber would otherwise pay to the utility. *Id.* at ¶ 45. As alleged by Defendants, this process results in owners of DGRs receiving a twofold benefit from ratepayers. *See* ECF No. 32 at 7. First, DGR owners receive from subscribers the full retail rate of electricity, rather than the wholesale market rate, which increases DGR owners' revenues. *Id.* Second, the rate DGR owners receive from subscribers includes the "volumetric delivery charge" the utility company would normally receive from the subscriber that includes the transmission and distribution charges. *Id.* However, the utility—not the DGR—is still *delivering* the electricity, so the utility is still incurring the transmission and distribution costs. *Id.* As such, the delivery costs of electricity are shifted to ratepayers through a fixed monthly charge on each ratepayer's utility bill. *See id.*

Since the expansion of the NEB Program in 2019, electricity prices in Maine have risen dramatically due to factors unrelated to community solar developers, such as the

---

[2] According to Plaintiffs, because the cost of constructing large solar arrays requires significant upfront investment, the State expanded the NEB Program as a way to induce the construction of large community solar generators: the DGRs. ECF No. 3 at 1. Plaintiffs assert the DGRs provide "considerable benefits" to Maine, including "energy price suppression, [] reduced greenhouse gas emissions[,] and other environmental benefits." *Id.* at 2.

2022 Russian invasion of Ukraine and severe winter storms in Maine in 2023 and 2024. Sanborn Dec. ¶ 39. Additionally, transmission and distribution costs have been impacted by an increase in investment from utility companies to maintain, modernize, and replace aging infrastructure. *Id.* Each of these events caused spikes in the costs of both energy supply and delivery. *See id.* Additionally, because the value of the credit given to subscribers is tied to the total retail rate—which includes these inflated delivery costs that solar developers do not actually incur—these price hikes have resulted in an unexpected windfall for larger solar generators. *Id.* ¶ 40. Consequently, the general public bears the burden, as utility companies must raise rates for all ratepayers to fund the higher credit payments triggered by these external costs. *See id.* ¶¶ 39–40. The scale of this increase is stark: the total cost of NEB has risen from approximately $8.7 million in 2021 to an estimated $158.6 million in 2025, with approximately $47 million attributable to the kWh credit program. *See id.* ¶ 44; Zeh Dec. ¶ 55. In an effort to rein in the rising costs of NEB, the Maine legislature has since considered, and enacted, various bills and proposals amending the NEB Program, including imposing additional requirements and restrictions on DGRs. *See* Zeh Dec. ¶¶ 68–71; *see also* ECF No. 32 at 9–10.

### III.    LD 1777 ("Project Charge")

The State's most recent effort to reduce NEB costs is the enactment of the 2025 NEB Act, or "LD 1777"—the legislation Plaintiffs now challenge. As relevant here, LD 1777 imposes a monthly "Project Charge" on participating DGRs in the kWh credit program to offset costs associated with the NEB Program.[3] Sanborn Dec. ¶ 60. The statute also

---

[3] LD 1777 was signed into law on June 27, 2025, and the Project Charge was scheduled to go into effect on January 1, 2026. On November 24, 2025, Plaintiffs filed their complaint and motion for a preliminary injunction against LD 1777. ECF Nos. 1, 3. During the first week of December 2025,

prescribes the amount of the Project Charge and tiers it based on the size and capacity of the DGR.[4] Zeh Dec. ¶ 87. Under LD 1777, if a DGR owner fails to pay the Project Charge, the utility company is required to cease applying credits to subscribers' utility bills and prohibit the application of any credits that accrue during periods of non-payment of the Project Charge. *Id.* at ¶ 102. According to Defendants, the legislature enacted LD 1777 to offset costs imposed by the NEB Program, thus reducing the transmission and distribution costs otherwise borne by ratepayers. *See id.* at ¶ 104. However, the revenue raised by the Project Charge likely will still not fully recover the overall NEB and kWh credit program costs. For instance, current estimates project the Project Charge will generate approximately $28 million in 2026, while kWh credit program costs are expected to reach at least $47 million. Sanborn Dec. ¶ 65.

LD 1777 also provides for an "off-ramp" for DGR owners who may not want to continue participating in the NEB Program. An owner of a DGR with less than a 75% subscription rate may exit the NEB Program by entering into a "power purchase agreement" ("PPA") with the utility company in its service territory. *Id.* at ¶ 72; Zeh Dec. ¶ 89. Defendants assert the PPA option cost to ratepayers is less than the continued participation of DGRs in the NEB Program, while still providing benefit to DGR owners.

---

the Court held several telephone conferences with counsel for parties to discuss the briefing and hearing schedule for Plaintiffs' motion, given the statute's January 1, 2026, implementation deadline. ECF Nos. 22, 25, 29. Following these conferences, Defendant PUC postponed collection of any Project Charges to March 1, 2026. ECF No. 46 at 1 ("By unanimous vote, the [PUC] determined . . . it will not open, during the time period January 1, 2026 through March 2, 2026, an investigation into any transmission and distribution utility who is directed by statute or rule to assess the recently enacted net energy bill project charge but fails to do so.").

[4] Under LD 1777, "the initial monthly charge must be for a distributed generation resource with a capacity of: (A) Three megawatts or more and less than 5 megawatts, $6.00 multiplied by the nameplate capacity of the resource in kilowatts; (B) One megawatt or more and less than 3 megawatts, $2.80 multiplied by the nameplate capacity of the resource in kilowatts; and (C) Less than one megawatt, zero." Zeh Dec. ¶ 87 (citing 35-A M.R.S. § 3209-F(3)).

*See* Sanborn Dec. ¶ 74. According to Defendants, these benefits include a guaranteed contract price for up to twenty years and greater revenue stability by reducing exposure to fluctuation in electric rates, subscription rates, and any future regulatory changes. *See id.* ¶¶ 73–74, 79; Zeh Dec. ¶ 91.

In their motion, Plaintiffs assert they "collectively own—directly or indirectly—84 community solar projects" enrolled in the kWh credit program throughout Maine, "that were induced by, and constructed in reliance on, the NEB Program's statutory framework" as it existed prior to LD 1777. ECF No. 3 at 3. Plaintiffs assert they relied on the original program structure to secure real property rights, obtain project financing, and complete construction of their solar facilities. *See id.* at 3–4. Because NEB participation was central to project financing, the governing debt instruments for these projects specifically mandated continued participation in the NEB Program. *Id.* at 4. Plaintiffs contend that even if they could exit the NEB to avoid the Project Charge, all but four projects would be unable to meet their financial obligations by selling energy on the wholesale power markets. *Id.* at 5. Plaintiffs argue that such an outcome would trigger widespread defaults, foreclosure, and the loss of their real property. *Id.*

## DISCUSSION

"To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *New Comm*

7

*Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)). However, "[i]njunctive relief is an extraordinary and drastic remedy that is never awarded as of right." *Carey v. Town of Rumford*, 25-cv-00356, 2025 WL 2978795, at *2 (D. Me. Oct. 22, 2025) (quoting *Calvary Chapel of Bangor v. Mills*, 459 F. Supp. 3d 273, 282 (D. Me. 2020)).

## I.     Arguments

Plaintiffs now move to enjoin the enforcement of LD 1777 and the associated Project Charge, alleging it constitutes an unconstitutional per se taking under the Fifth Amendment.[5] ECF No. 3 at 6–7. Plaintiffs argue they are likely to succeed on the merits of their claim based on the application of the "unconstitutional conditions" doctrine to the Takings Clause. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013); *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831 (1987). Plaintiffs' argument rests on two pillars. First, they contend the Project Charge is an unconstitutional monetary exaction tied specifically to their real property: the DGRs. *See* ECF No. 3 at 8–11. Second, Plaintiffs assert the State cannot demonstrate either a sufficient nexus or rough proportionality between the Project Charge and the social impact of their participation in NEB, as is required for such monetary exactions under the *Nollan-Dolan* standard. *See id.* at 11–13.

Plaintiffs next argue LD 1777 cannot be upheld as constitutional on the theory that participation in the NEB Program—and the resulting assessment of the Project Charge— is voluntary. Instead, they contend their participation is effectively *involuntary* due to

---

[5] While Plaintiffs allege three counts against the implementation of LD 1777's Project Charge—a per se taking, a regulatory taking, and a violation of the Contracts Clause, *see* ECF No. 1 at 78–83, their motion for a preliminary injunction is limited strictly to their per se taking claim, as confirmed by Plaintiffs' counsel at the January 23 hearing.

both legal and economic compulsion. *Id.* at 16–23. First, Plaintiffs assert existing financing agreements and contracts mandate they maintain their status in NEB to satisfy debt obligations. *Id.* at 16. Second, Plaintiffs argue exiting the NEB Program to sell power on the wholesale market or entering into a PPA are not viable economic options. Plaintiffs argue selling power on the wholesale market would cause revenues to fall below debt service requirements, leading to imminent default and the loss of their real property. Plaintiffs argue this "draconian" consequence makes leaving the NEB Program equivalent to leaving the energy market entirely, thus making the decision whether to participate in NEB involuntary. *Id.* at 17–23. Plaintiffs likewise assert PPAs are only available to DGRs below a 75% subscription rate and no Plaintiff would qualify for that option based on their current subscription rates of at least 85%. ECF No. 38 at 12 (citing ECF No. 1 at ¶ 119(a)).[6]

In response, Defendants maintain that Plaintiffs are unlikely to succeed on the merits of their claim, primarily because the Project Charge does not fall under either established Takings Clause exceptions for monetary assessments—the *Koontz-Nollan-Dolan* "unconstitutional conditions" exception, or the specific, identifiable fund of money exception. ECF No. 32 at 20. Defendants further dispute Plaintiffs' characterization of participation in the NEB as involuntary and offer multiple alternatives to participation, including selling solar power on the wholesale market, or entering into a PPA directly with utility companies, which offer rates for their solar power that are significantly higher than wholesale market rates. *See id.* at 13.

---

[6] Defendants assert, by way of a declaration from Heather Sanborn, that Plaintiffs have the option to either unilaterally terminate subscribers, or consolidate subscribers from one DGR to another, to allow each DGR to be eligible to enter into a PPA rather than sell solar power on the wholesale market. Second Heather Sanborn Decl. ("Second Sanborn Dec."), ECF No. 43 at ¶¶ 4–6.

Plaintiffs further allege they will suffer irreparable harm if LD 1777 is not enjoined for two reasons: (1) harms flowing from the violation of their constitutional rights under the Taking Clause are per se irreparable; and (2) should Plaintiffs later prevail on the merits, Maine's sovereign immunity would prevent them from recouping any payments already made under the Project Charge. ECF No. 3 at 26–28. Defendants dispute Plaintiffs' argument on irreparable harm, both because no established case law supports the proposition that Takings Clause violations constitute per se irreparable harm, and because should Plaintiffs prevail, they could seek reimbursement from utility companies directly, bypassing any sovereign immunity issues. ECF No. 32 at 28–29.

Finally, Plaintiffs argue the balance of the equities and the public interest both favor the issuance of an injunction. ECF No. 3 at 28–29. In response, Defendants contend that LD 1777 and the Project Charge are essential to the sustainability of the NEB Program and the State's renewable energy goals, in addition to the State's need to provide relief to Maine ratepayers who subsidize these solar projects, each of which outweigh any "minimal harm" to the Plaintiffs. ECF No. 32 at 28–30.

## II.    Analysis

### A.    Likelihood of Success on the Merits

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). On this issue the district court need only make "an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross-Simons*, 102 F.3d at 16). Failure to demonstrate a likelihood of success on the merits is ordinarily dispositive. *See New Comm Wireless Servs.*, 287 F.3d at 9.

10

The Takings Clause of the Fifth Amendment of the Constitution, made applicable to the States through the Fourteenth Amendment, *see Chi., B. & Q.R. Co. v. City of Chi.*, 166 U.S. 226, 239 (1897), provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause principally serves "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

The Plaintiffs cannot demonstrate likelihood of success on the merits. The Project Charge does not fall within either recognized exception to the general rule that monetary assessments are not takings; neither the unconstitutional conditions exception nor the specific and identifiable fund of money exception applies here. Moreover, Plaintiffs' participation in the NEB Program is voluntary, which independently precludes their per se takings claim. The Court addresses each of these issues below.

*1.  Exceptions for Monetary Assessments*

Federal courts generally reject the notion that the obligation to pay a monetary assessment constitutes an unconstitutional taking under the Fifth Amendment. *See, e.g.*, *United States v. Sperry Corp.*, 493 U.S. 52, 62 n.9 (1989); *E. Enters. v. Apfel*, 524 U.S. 498, 540 (Kennedy, J., concurring in judgment and dissenting in part) ("The law simply imposes an obligation to perform an act, the payment of benefits. . . . To call this sort of governmental action a taking as a matter of constitutional interpretation is both imprecise and, with all due respect, unwise."); *see also Commonw. Edison Co. v. United States*, 271 F.3d 1327, 1340 (Fed. Cir. 2001) ("In short, while a taking may occur when a specific fund of money is involved, the mere imposition of an obligation to pay money . . . does not give rise to a claim under the Takings Clause."). Indeed, "all circuits that have addressed the

issue have uniformly found that a taking does not occur when the statute in question imposes a monetary assessment that does not affect a specific interest in property." *McCarthy v. City of Cleveland*, 626 F.3d 280, 285 (6th Cir. 2010) (collecting cases).

However, a statutory monetary assessment may alone constitute a taking in certain, limited circumstances. First, a taking may occur when the government imposes a "monetary exaction" or obligation as an unconstitutional condition for the grant of a land use permit. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013); *see Dolan v. City of Tigard*, 512 U.S. 374, 386–88 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 831–32 (1987). The *Nollan-Dolan* line of cases represents a "special application" of the unconstitutional conditions doctrine in the Takings Clause context, which "protects the Fifth Amendment right to just compensation for property the government takes when owners apply for land-use permits." *Koontz*, 570 U.S. at 604. Under the *Nollan-Dolan* doctrine, the "government may not condition the approval of a land-use permit on the owner's relinquishment of a portion of his property unless there is a 'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use." *Id.* at 599. Second, a taking may occur when the government directs payments from a specific and identifiable fund of money. *See, e.g.*, *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 160 (1998); *Webb's Fabulous Pharms., Inc. v. Beckwith*, 449 U.S. 155, 163–64 (1980); *Brown v. Legal Found. Of Wash.*, 538 U.S. 216. 235 (2003). For the reasons that follow, the Court concludes neither exception applies to the monetary assessment of LD 1777's Project Charge.

### i.    Unconstitutional Conditions Doctrine

Plaintiffs first argue the Project Charge constitutes a per se taking under the unconstitutional conditions doctrine. ECF No. 3 at 8. The "fairly well-developed" doctrine

of unconstitutional conditions prevents the government from requiring "a person to give up a constitutional right . . . in exchange for [a] discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 46 (1st Cir. 2002) (quoting *Dolan,* 512 U.S. at 385). The Supreme Court has noted "the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." *Koontz*, 570 U.S. at 606. Here, Plaintiffs contend the Project Charge unconstitutionally burdens their real property rights and must therefore withstand scrutiny from the *Nollan-Dolan* nexus and rough proportionality standard.

However, unlike the instant case, the *Koontz-Nollan-Dolan* line of cases all involved Takings Clause challenges where the government conditioned the approval of a land use permit on a concession or payment by landowners. *See id.* at 599 (conditioning approval of construction permit on owner's deed of conservation easement to district and landowner's funding of offsite mitigation projects on public lands); *Nollan*, 483 U.S. at 827 (conditioning approval of construction of larger house on beachfront property on public easement across property for beach access); *Dolan*, 512 U.S. at 378 (conditioning approval of store expansion and paving of parking lot on dedication of land for public greenway and for pedestrian/bicycle pathway to relieve traffic congestion). Indeed, the *Koontz* Court explicitly stated "*Nollan* and *Dolan* 'involve a special application' of th[e unconstitutional conditions] doctrine that protects the Fifth Amendment right to just compensation for property the government takes when *owners apply for land-use permits*." *Koontz*, 570 U.S. at 604 (quotation modified); *see also Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 275–76 (2024) (applying *Nollan-Dolan* to legislatively imposed development impact fees conditioned on building permit approval).

13

Plaintiffs argue, both in their pleadings and during oral argument, that the distinction between the permit approval in *Koontz* and their NEB Program participation is "immaterial to the constitutional analysis," because in both cases, "permission from the government . . . is conditioned upon giving up a right linked to specific property." ECF No. 3 at 10 n.7. However, the Plaintiffs fail to establish the constitutional right they must give up in exchange for a government benefit so as to constitute a violation of the unconstitutional conditions doctrine. Put another way, the Court finds Plaintiffs do not have a constitutional right to continued participation in the NEB Program to sell their solar power at a specific or preferable rate. Unlike the permit conditions in *Koontz* and other cases, LD 1777 does not regulate land use or prevent Plaintiffs from continuing to develop and generate solar power outside of the NEB Program. The record demonstrates instead that Plaintiffs may continue to generate and sell solar power through alternative means, such as on the wholesale market and through PPAs.[7] *See* ECF No. 32 at 13.

The unconstitutional conditions cases Plaintiffs cite do not alter my determination that LD 1777 does not burden any constitutional right of Plaintiffs, should they continue to participate in the NEB Program. For instance, in *Levin v. City and Cnty. of S.F.*, 71 F. Supp. 3d 1072 (N.D. Cal. 2014), the district court held that a city ordinance requiring property owners who sought to withdraw their rent-controlled property from the rental market to pay a lump sum payment to displaced tenants, constituted an unconstitutional taking by "conditioning property owners' right to withdraw their property on a monetary

---

[7] During the hearing, Plaintiffs argued the alternative options to participation in the NEB Program are not viable primarily due to economic impact and loss in revenue received under the NEB Program and kWh credit program. However, for reasons described in further detail below, the Court finds that a mere loss in economic benefit does not constitute a per se taking. *See* Section II.A.2, *infra*; *see also Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 679 (1st Cir. 1998).

exaction not sufficiently related to the impact of the withdrawal." *Levin*, 71 F. Supp. 3d at 1074. In reaching this conclusion, however, the *Levin* court specifically applied the "special application" of the *Nollan-Dolan* cases involving land use permits and monetary exactions. *See id*. at 1081. Crucial to the court's holding was the fact the ordinance at issue required a property owner who wished to withdraw their property to apply to the city for an "Ellis Act permit," which was granted only on the condition that the property owner would pay any evicted tenant from the withdrawn unit an "enhanced" lump-sum payout. *Id*. Unlike the statutory scheme requiring a permit in *Levin*, LD 1777 here does not require Plaintiffs to apply for a permit to continue using their land to generate and sell solar power. Plaintiffs remain free to withdraw from the NEB Program and sell solar power elsewhere without paying a third party or without applying for a permit. Further, while the *Levin* plaintiffs sought to exit a government program without penalty, Plaintiffs here seek to remain in a government program while avoiding any costs.

Accordingly, because the monetary assessment imposed by LD 1777 does not constitute an unconstitutional condition on Plaintiffs' property rights, the Court need not apply the *Nollan-Dolan* nexus and proportionality standard. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 702 (1999) ("Although in a general sense concerns for proportionality animate the Takings Clause . . . we have not extended the rough-proportionality test of *Dolan* beyond the special context of exactions—land-use decisions conditioning approval of development on the dedication of property to public

use." (internal citation omitted)); *Reilly*, 312 F.3d at 46 n.20 (declining to apply *Dolan* rough-proportionality test in non-land permit use context).[8]

Regardless, even if the Project Charge is analyzed as a monetary exaction under the unconstitutional conditions doctrine, it easily satisfies the *Nollan-Dolan* standard. LD 1777 and the Project Charge respond directly to an unforeseen increase in Maine electricity rates that has created an "unexpected windfall to solar generators in the [NEB] program and an uncontrolled exponential growth in the costs of the program that must be borne by Maine ratepayers." Sanborn Decl. ¶ 40. In 2026, the kWh credit program specifically will cost Maine ratepayers $47 million, which the Project Charge will offset by an estimated $28 million. *Id*. at ¶ 65. These costs are tied directly to Plaintiffs' participation in the NEB and kWh credit programs, as the cost-shifting mechanisms of the programs result in increased fixed charges on ratepayers' utility bills. Accordingly, the Project Charge bears an "essential nexus" and "rough proportionality" to the State's legitimate interest in reining in costs to Maine ratepayers. *See Dolan*, 512 U.S. at 386.

Plaintiffs instead argue the record demonstrates the NEB Program results in net societal benefits; consequently, the Project Charge necessarily lacks the requisite nexus and rough proportionality, as there are no societal costs to offset. *See* ECF No. 38 at 9–11. In support, Plaintiffs point to a Maine PUC report highlighting the NEB Program's environmental and reliability benefits generally. *Id*. at 10; *see* ECF No. 38-4. However,

---

[8] Although *City of Monterey* and *Reilly* were both decided prior to the Supreme Court's decision in *Koontz*, the *Koontz* decision does not alter this analysis. *Koontz* expanded the *Nollan-Dolan* standard only in that it included the *denial* of land use permits (in addition to the *approval* of land use permits) conditioned on the surrender of constitutional rights—it did not expand the doctrine's application beyond the realm of the land-use-permit context. *See Koontz*, 570 U.S. at 606 ("The principles that undergird our decisions in *Nollan* and *Dolan* do not change depending on whether the government *approves* a permit on the condition that the applicant turn over property or *denies* a permit because the applicant refuses to do so.") (emphasis in original).

that same PUC report also discusses the net costs imposed by the NEB Program on Maine ratepayers. *See generally* ECF No. 38-4 at 44–55. Defendants assert the Maine legislature, in enacting LD 1777 and the Project Charge, specifically focused its cost-benefit analysis on the financial burden to those ratepayers. *See* Sanborn Dec. ¶ 65 ("The amount of the initial project charge . . . was carefully considered during the negotiations regarding LD 1777, as legislators were particularly concerned about striking a careful balance between reining in the unaffordable cost of the program to ratepayers and ensuring financial viability of existing [DGR] projects."). This Court's role is not to second-guess the legislature's policy judgment as to which specific costs or benefits should be prioritized. Because the legislature identified a documented cost to Maine ratepayers and tailored the Project Charge to mitigate that specific impact, the Court finds that even if the Project Charge could be characterized as a monetary exaction under the Takings Clause, it satisfies the *Nollan-Dolan* nexus and proportionality standard and therefore passes constitutional muster.[9]

## ii.    Specific and Identifiable Fund of Money

The second exception to the general rule against monetary assessments rising to the level of an unconstitutional taking applies when the government directs payments from a specific and identifiable fund of money. *See, e.g.*, *Phillips*, 524 U.S. at 160 (seizure of interest income held in lawyer trust accounts is private property of the owner of the

---

[9] Similarly, even if analyzed as a user fee, the Project Charge is constitutional. Taxes and user fees generally are not takings. *See Koontz*, 570 U.S. at 615. A user fee is constitutional if it is a "fair approximation of the cost of benefits supplied," *United States v. Sperry Corp.*, 493 U.S. 52, 60 (citation omitted) (1989), and only becomes a taking if "so clearly excessive as to belie [its] purported character as [a] user fee[]," *id.* at 62. Because the Project Charge is designed to offset specific costs shifted to Maine ratepayers through Plaintiffs' NEB participation, it does not reach the level of "clear excessiveness" required to constitute a taking.

principal under Takings Clause and constitutes takings violation); *Webb's*, 449 U.S. at 163 (appropriation of interest accruing on an interpleader fund is "analogous to the appropriation of the use of private property" to constitute takings violation); *Brown*, 538 U.S. 216, 235 (2003) (state court's seizure of interest on client funds held in escrow account constituted an unconstitutional taking).

Here, Plaintiffs argue that "DGRs are similar to [] interest-bearing accounts" because DGR assets, once built and operational, function "in all relevant aspects like a bank account—used to collect revenue and pay debt." ECF No. 3 at 14–15. Specifically, Plaintiffs contend that because a DGR's only cash flow consists of passive revenue from customer subscriptions—which they liken to interest generated on the asset itself—the Project Charge unlawfully confiscates their property.[10] *See id.* at 15. In response, Defendants argue characterizing DGR revenues as specific funds of money akin to interest-bearing accounts is misplaced; instead, they contend the Project Charge operates like any other monetary liability incurred by a business that may happen to be satisfied by a DGR's operating revenue. ECF No. 32 at 27.

The Court disagrees that Plaintiffs' DGRs function like the interest-bearing accounts in *Webb's* or other similar cases. For instance, as discussed during the hearing, the operation of DGRs requires ongoing maintenance, subscriber acquisition, and servicing. Consequently, DGRs resemble active, profit-earning business entities rather than passive interest-bearing escrow accounts. Thus, the Court finds LD 1777 and the

---

[10] "Put simply, the DGRs are akin to a bank account that holds KWH Plaintiffs' principal; the revenue collected from subscriber credits is best analogized as the interest those assets earn; and the Project Charge skims that interest making it an unlawful, targeted exaction, not a broad-based fee." ECF No. 38 at 13–14.

Project Charge do not constitute a per se taking under the "specific and identifiable fund of money" exception.

### 2. *Voluntary Participation*

Even if Plaintiffs could establish that the Project Charge falls within either established exception for monetary assessments—which they cannot—their claim would still fail because their participation in the NEB is voluntary.[11] The Supreme Court has made clear that even in the context of per se takings, the distinction between a mandatory requirement and voluntary condition remains relevant. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 365–67 (2015). Accordingly, the Court finds that Plaintiffs' participation in the NEB is voluntary and thus cannot sustain their per se takings claim.[12]

For statutes such as LD 1777 to constitute a per se taking, a "property owner must be legally compelled to engage in price-regulated activity." *Franklin Mem'l Hosp. v. Harvey*, 532 F. Supp. 2d 204, 208 (D. Me. 2008) (quoting *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993)). Conversely, where a service provider voluntarily participates in a price-regulated program, "there is no legal compulsion . . . and thus there can be no taking." *Id.* (quoting *Garelick*, 987 F.2d at 916). The Takings Clause, therefore, does not shield voluntary participants from the inherent risk of regulatory or statutory changes

---

[11] The Court notes that Plaintiffs raised their argument regarding the inapplicability of voluntariness to the *Koontz-Nollan-Dolan* line of cases for the first time at the January 23 hearing. However, their brief specifically addresses the issue of voluntariness extensively. *See, e.g.*, ECF No. 3 at 17 ("*Horne* is just one brick in a solid wall of case law demonstrating that economic compulsion is sufficient to render participation in . . . the NEB Program[] *involuntary*.") (emphasis in original)). Many of the cases cited by parties in their briefing discussed voluntariness specifically in the context of regulatory takings—a theory Plaintiffs have explicitly disclaimed for this Preliminary Injunction Motion. In any event, for the reasons explained herein, the Court finds Plaintiffs' participation in the NEB Program is voluntary.

[12] Regardless, given my holding that the Project Charge does not fit into either exception for monetary assessments, *see* Section II.A.1, *supra*, the issue of voluntariness is non-dispositive.

that may alter their property rights. *See Philip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 679 (1st Cir. 1998).

Plaintiffs argue their NEB participation is "involuntary" due to a combination of legal and economic constraints. Legally, they point to third-party financing agreements and contracts that mandate their continued participation in the NEB Program. *See* ECF No. 3 at 15–17. Economically, they argue their only alternatives to participation—joining the PPAs and selling power on the wholesale market—are either not feasible because of the DGRs' current subscription rates or, would result in "devastating economic impacts," including widespread debt defaults and foreclosures. *Id.* at 20–21.

The Court is unpersuaded. As an initial matter, private contractual obligations to third-party lenders do not transform a voluntary state program into a compulsory one. The State was not a party to those financing agreements, and a developer's decision to pledge its NEB participation as collateral is a private and independent business risk. Furthermore, "the choice to participate in a voluntary government program does not become involuntary simply because the alternatives . . . appear to entail worse, even substantially worse, economic outcomes." *Boehringer Ingelheim Pharms., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 150 F.4th 76, 90 (2d Cir. 2025) (rejecting, in takings context, pharmaceutical company's argument that opting out of Medicaid programs would bring economic devastation, making any "choice" to avoid program "illusory").

Plaintiffs are sophisticated commercial entities operating in a highly regulated industry. Given the history of rapid statutory and regulatory changes within the NEB Program since 2019, *see generally* ECF No. 32 at 4–11, the possibility of further legislative modification was not only foreseeable, but expected, *see Harshbarger*, 159 F.3d at 679 (recognizing the "reality that a governmental entity which creates a market's supply or

20

sets its prices may be expected to alter property rights in the course of modifying its regulations"). While the "exit ramps" available to Plaintiffs—such as the wholesale market or consolidating subscribers to qualify for PPAs—may be less profitable or even lead to significant economic loss, they still remain alternatives to the Project Charge. Because the Plaintiffs retain the right to exit the NEB Program, their continued participation in the program is a choice, not a confiscatory taking. Accordingly, Plaintiffs cannot establish the compulsion necessary to sustain a per se Takings Claim on these grounds.

### B. Irreparable Harm

While certain constitutional violations—such as those involving free speech or privacy rights—carry a qualitative importance that makes them "irremediable by any subsequent relief," not all constitutional violations constitute per se irreparable harm. *Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 62 (D. Me. 2022), *aff'd*, 51 F.4th 1 (1st Cir. 2022) (quoting *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 484 (1st Cir. 2009)). Plaintiffs argue a Takings Clause violation alone constitutes irreparable harm and cite numerous cases involving violations of various constitutional rights, but none relating specifically to the Takings Clause. *See* ECF No. 3 at 26–27. The Takings Clause does not proscribe the taking of property; it proscribes the taking of property without just compensation. *See Knick v. Twp. of Scott, Pa.*, 588 U.S. 180, 189 (2019). Because the injury from a takings violation is the denial of just compensation, the potential for such a violation does not, by itself, constitute irreparable harm. Unlike the violation of free speech or privacy rights, a takings violation lacks the "qualitative importance as to be irremediable by subsequent relief." *Cormier*, 586 F. Supp. 3d at 62.

Plaintiffs further contend that Maine's sovereign immunity would prevent them from recouping Project Charge payments should they ultimately prevail. ECF No. 3 at

27–28. In response, Defendants contend that because Plaintiffs pay the Project Charge to utilities rather than the State, nothing precludes Plaintiffs from later seeking reimbursement from those utilities directly. ECF No. 32 at 29. Irreparable harm ordinarily consists of "a substantial injury that is not accurately measured or adequately compensable by money damages." *Ross-Simons of Warwick, Inc., v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000); *see Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003) ("Where a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages, irreparable harm exists."). Should Plaintiffs ultimately prevail on the merits, which, as explained above, the Court finds unlikely, they could recover any monetary damages resulting from the Project Charge directly from the utility companies.[13] Accordingly, Plaintiffs have failed to establish irreparable harm.

### C. Balance of Equities and Public Interest

Finally, the remaining factors—the balance of equities and the public interest— both weigh against a preliminary injunction. The third and fourth factors of the preliminary injunction standard merge "when the government is the opposing party." *Does 1–6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quotation modified). The Defendants have already stayed implementation of LD 1777 until March 1, 2026. Any further delay in implementation of the law risks the sustainability of the NEB Program in the face of Maine's rapidly increasing electricity rates. *See* ECF No. 32 at 29–30. Plaintiffs'

---

[13] Plaintiffs argue that because Defendants control how and when funds are disbursed to ratepayers, any funds used to reduce rates would be beyond the reach of the utilities or the Court. ECF No. 38 at 15. However, Plaintiffs do not explain why they could not recover a future judgment directly from the utility companies, who would then offset those costs by readjusting rates for all ratepayers—effectively restoring the NEB Program's status quo without implicating the State's sovereign immunity.

arguments regarding the final factors rest primarily on the alleged unconstitutional nature of LD 1777. *See* ECF No. 3 at 28 ("It is hard to conceive of a situation where the public interest would be served by enforcement of an unconstitutional law or regulation.") (quoting *Condon v. Andino, Inc.*, 961 F. Supp. 323, 331 (D. Me. 1997)). Because the Court finds Plaintiffs' constitutional claim unlikely to succeed, this argument is unavailing.

## CONCLUSION

Accordingly, for the foregoing reasons, the Plaintiffs' motion for a preliminary injunction, ECF No. 3, is **DENIED**.

SO ORDERED.

Dated this 17th day of February, 2026.

/s/ Stacey D. Neumann
UNITED STATES DISTRICT JUDGE